58 CCPA

**B & W WHOLESALE CO., Inc.,**
**Appellant,**

v.

The **UNITED STATES,** Appellee.
**Customs Appeal No. 5388.**

United States Court of Customs and Patent Appeals.

Feb. 4, 1971.

Barnes, Richardson & Colburn, New York City, attorneys of record, for appellant; Joseph Schwartz, New York City, of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Frederick L. Ikenson, New York City, for the United States.

Before RICH, ALMOND, BALDWIN and LANE, Judges, and NICHOLS, Judge, United States Court of Claims, sitting by designation.

RICH, Judge.

This appeal is from a judgment of the Third Division of the Customs Court, Appellate Term, 63 Cust.Ct. 691, A.R.D. 262 (1969), affirming the judgment of a single judge sitting in reappraisement, 58 Cust.Ct. 728, R.D. 11311 (1967). The nature of the goods is unimportant to the issues. They are small hardware store items exported in August 1961.

The question in litigation is value. It is agreed that the proper basis of appraisal is export value as defined by section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.[1]  In appraising the

1.  (b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

merchandise, the appraiser and both courts below disallowed an alleged buying commission of 5% and all inland charges for freight, storage, insurance, etc., listed on the invoice but excluded by appellant from the value, and added them to the invoiced ex-factory prices. The latter prices are not in dispute as to amount. The questions below were whether appellant has sustained its burden of proving that the 5% buying commission was a bona fide commission rather than a proper part of the export value and whether the inland charges were improperly included by the appraiser in export value. On appeal to this court, the only question is whether the Appellate Term's decision was supported by substantial evidence. We find it was and affirm.

The merchandise was imported into the United States by appellant, B & W Wholesale Supply Co., of Minneapolis, Minnesota. Its alleged "buying agent" in Japan was M. Matsumoto & Co., Ltd., of Kobe, Japan. The imported merchandise was manufactured by various manufacturers in Osaka, Japan. The imports were invoiced F.O.B. Kobe.

The two questions we have to examine, to see whether the findings below were supported by substantial evidence, are (1) whether appellant sustained its burden of proving that its relation to Matsumoto was that of principal and agent rather than that of buyer and seller and (2) whether appellant sustained its burden of proving that the merchandise was freely sold or offered for sale in accordance with section 402(b) at the invoiced ex-factory prices.

### The "Buying Commission"

According to an affidavit of its president and principal stockholder, introduced into evidence by appellant,

> M. Matsumoto & Co. Ltd. is not a manufacturer but a trading house. We buy and sell goods sometimes for our own account, and sometimes as buying agent.

Because he included the "commission" paid Matsumoto in the export value of these imported goods, the appraiser must have found that in the instant transaction Matsumoto bought the subject merchandise for its own account and resold it to B & W rather than that Matsumoto acted solely as B & W's buying agent. Since it is uncontroverted that the subject merchandise was not purchased by Matsumoto until after that company had received an order for it from B & W and since the samples of the subject merchandise introduced into evidence both bear the mark of a company associated with B & W (indicating that the goods were already destined for the group of companies associated with B & W when they came into Matsumoto's hands and were not part of a stock of goods bought and maintained by Matsumoto for eventual resale as opportunities presented themselves), the appraiser's determination must have been based on the relationship between Matsumoto and B & W from the time the order was placed until the goods were shipped from Japan.

The relationship between Matsumoto and B & W was brought out, not only by Mr. Matsumoto's affidavit, but by the testimony at trial of Mr. Robert L. Bernstein, appellant's treasurer and the employee who placed the order for the instant merchandise. According to Mr. Bernstein, after B & W had placed an order with Matsumoto, Matsumoto would place a corresponding order or orders with factories in Japan, but B & W had no control over which factories Matsumoto ordered the goods from. Again, although B & W paid Matsumoto bills which included a component for inland freight, B & W did not receive substantiation of the inland freight charges and did not even control the mode by which the goods were shipped. Finally, when questioned whether B & W would "have recourse to the manufacturer," "If there were a loss or a pilferage between a factory and * * * [B &

W's] warehouse in Kobe," Mr. Bernstein replied:

> According to my best belief, we don't take possession of the merchandise until it gets into a warehouse in Kobe. I don't believe we take possession until it gets on board ship.

As the American Law Institute's Restatement (Second) of Agency says,

> If the existence of an agency relation is not otherwise clearly shown, as where the issue is whether a trust or any agency has been created, the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relation is not that of agency. [Id. at § 146, p. 61.]

Appellant here stresses the considerable evidence in the record that the relation between Matsumoto and B & W *was* that of agency. However, it does not attack our longstanding rule that findings of fact in a reappraisement case will not be disturbed if there is "any substantial evidence" in support of those findings. See A. Zerkowitz & Co. v. United States, 435 F.2d 576, 58 CCPA C.A.D. 1005 (Dec. 30, 1970). The kind of argument appellant has made here is correctly addressed to a single judge sitting in reappraisement and to the Appellate Term reviewing his decision, both of whom are charged with determining whether the importer has proved by a preponderance of the evidence that the findings of the appraiser were incorrect, but is not properly addressed to this court so long as we adhere to our present rule.

Limiting ourselves to the question of whether there is "any substantial evidence" in the record to support the Customs Court's finding that the alleged buying agency between the shipper and the importer was not bona fide, we find that there is substantial evidence to support a finding of fact that both B & W and Matsumoto understood that Matsumoto was not subject to the control of B & W as to the manner in which Matsu-

moto processed and handled the imported merchandise before it left Matsumoto's hands. The legal conclusion that an agency relation did not exist between Matsumoto and B & W at that time follows from that finding as a matter of course. Absent a bona fide agency relation, there was no basis for a "commission." Accordingly, we affirm the judgment below that the 5% "buying commission" was really a part of export value.

## Ex-Factory Prices

The appraiser added the following inland charges listed on the invoice to the invoiced ex-factory prices in determining the export value of the merchandise:

| | |
|---|---|
| Inland Freight | ¥ 10,000 |
| Storage | 830 |
| Inland Insurance | 750 |
| Inspection Charges | 5,200 |
| Hauling & Lighterage | 8,900 |
| Petties | 1,000 |
| | ¥ 26,680 ($74.11) |

Two things may be inferred from this action on the appraiser's part. First, because of the presumption of administrative correctness attaching to the appraiser's actions, and because these charges clearly would not have been includable in the export value of the appraised merchandise if,

> * * * at the time of [its] exportation to the United States * * * such or similar merchandise * * * [was] freely sold or, in the absence of sales [was] offered for sale in the principal markets of * * * [Japan], in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States

at the "ex-factory" prices at which the merchandise was entered, it is readily inferable that the appraiser found that the claimed ex-factory prices did not satisfy the above statutory definition of export value in some respect. Second, it may be inferred that the appraiser found that merchandise like or similar to the instant merchandise was either

freely sold or offered for sale for exportation to the United States at a price equal to the claimed ex-factory price plus the added inland charges (a) in August, 1961,( b) in the principal markets of Japan, (c) in the usual wholesale quantities, and (d) in the ordinary course of trade. However, because the record is barren of evidence indicating in what specific respect or respects the appraiser found the claimed ex-factory prices did not satisfy the statutory definition of export value, neither we nor the Customs Court may presume, as the Government would have us do, that the subject merchandise was not "freely sold to all purchasers by the manufacturers on an ex-factory basis." Mannesmann-Meer, Inc. v. United States, 433 F.2d 829, 58 CCPA C.A.D. 995 (decided Oct. 29, 1970). Nevertheless, there is still a presumption of correctness attaching to the appraiser's *result* which is independent of the presumption of correctness attaching to the appraiser's subsidiary findings, and B & W therefore had the burden of proving that merchandise like or similar to the instant importation was sold or offered for

sale in accordance with the statutory definition of export value at the claimed ex-factory prices or at the alternatively claimed "ex-godown" prices.[2] A Zerkowitz & Co. v. United States, supra.

The single judge held that the importer had failed to establish by a preponderance of the evidence both that merchandise like or similar to the instant merchandise "was freely sold[3] by the manufacturers ex-factory" and "what the ex-factory price was, if any."[4] The Appellate Term affirmed, holding that appellant had failed to prove "that the merchandise was offered for sale in accordance with statutory export value at the claimed ex-factory prices."[5] Accordingly, appellant may not prevail here if there is any substantial evidence in the record either in support of the appealed appraisement or in derogation of the claimed appraisement. We find that, whatever may be the case as to the former, there is substantial evidence of the latter kind in the record.

Appellant's case as to the inland charges is in a very real sense dependent from its case as to the "buying commission," for once it has been accepted that

2. "Ex-godown" prices are defined by appellant as ex-factory prices plus inland freight to warehouse, which, in this case, was in Kobe.

3. We think implicit in his holding is a similar finding that the appellant had failed to establish by a preponderance of the evidence that merchandise like or similar to the instant merchandise was freely offered for sale by the manufacturers ex-factory, since appellant could have met its burden on this issue either way.

4. We note appellant's contention that, because the appraiser expressed his finding of value as an "ex-factory price" (i. e., the price at which the appellant entered the goods) plus the controverted charges, the appraisement is separable and that it is therefore entitled to rely upon the appraiser's determination that the price at which it had entered the goods was the ex-factory price. However, even assuming that this be so, the question is not what the ex-factory component of the appraised value was, but rather whether merchandise like or similar to the instant merchandise was in fact freely sold or of-

fered for sale, in accordance with the statutory definition of export value, at that ex-factory price. We agree with the Government that "the 'separability' doctrine does *not* relieve the appellant of proving that the merchandise in question was *freely* sold or offered for sale" at that price and not at a price one component of which was that price. United States v. Pan American Import Corp., 428 F.2d 848, 57 CCPA 134, C.A.D. 993 (1970).

5. Actually, the Appellate Term went further, holding that appellant had not offered "any substantial evidence" that the merchandise was so offered for sale. However, if the importer offered *no* substantial evidence on this point, it certainly did not carry its burden of persuasion, and it is not for the importer to complain of this statement of the procedural status of the parties at the level of the Appellate Term.

Again, we assume a parallel finding, this time that merchandise like or similar to the instant merchandise was not freely sold by its manufacturers at the claimed ex-factory prices.

Matsumoto acted as an independent middle-man in this transaction rather than as B & W's agent, the only evidence of a sale of merchandise like or similar to the instant merchandise which complies with section 402(b) in that the sale was "for exportation to the United States" is Matsumoto's sale to B & W, which was not at the claimed price. Limiting ourselves to the narrow scope of review set forth in A. Zerkowitz & Co. v. United States, supra, we conclude that this constituted substantial evidence from which the Customs Court could legitimately infer that merchandise like or similar to the instant merchandise was not freely sold or offered for sale at the claimed price "for exportation to the United States" in accordance with section 402(b) at the time of exportation to the United States of the merchandise here involved. Accordingly, we affirm the judgment below as to this, as well as the first issue.

Affirmed.