**UNITED STATES, Appellant,**

v.

**KNIT WITS (WILEY) et al., Appellees.**
**A.R.D. 251; Reappraisements**
**R65/1415, etc.**

United States Customs Court,
Second Division, Appellate Term.

March 10, 1969.

William D. Ruckelshaus, Asst. Atty. Gen. (Mollie Strum, New York City, trial attorney), for appellant.

Glad & Tuttle, Los Angeles, Cal. (Edward N. Glad, Los Angeles, Cal., of counsel), for appellees.

Before RAO, Chief Judge, and FORD and NEWMAN, Judges.

RAO, Chief Judge:

This is an application for review of a decision and judgment sustaining the importers' claim and holding that there was a *bona fide* buying agency; that the commission paid to the agent was not a part of the dutiable value of the merchandise, and that the appraiser erroneously included it as part of the appraised value. Knit Wits (Wiley) et al. v. United States, 59 Cust.Ct. 753, R.D. 11401.

The merchandise consists of wool knitwear for women produced by a number of manufacturers in Italy and exported to the United States during the period from July 1960 through August 1963.

It was stipulated that export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, was the proper basis for the appraisement of the merchandise and that the merchandise does not appear on the final list, 93 Treas.Dec. 14, T.D. 54521.

The official papers were received in evidence without being marked. The earlier invoices show Leon S. Sassoon as the seller-shipper and show three different prices, i. e., the "unit prices", the "export prices" which equal the "unit prices" plus a 5 percent commission on the "export prices", and the "home prices" which exceed the "export prices" by a little more than 5 percent. Near the end of 1961 the invoices show various manufacturers as the sellers and Leon S. Sassoon as the shipper. The three different values on the invoices, however, remain the same as above. In the latter part of 1962, the invoices still show various manufacturers as the sellers and Leon S. Sassoon as the shipper. The "unit prices" and the "export prices" are the same and the "home price" exceeds the former prices by a little more than 5 percent.

The invoices also show under the heading "Total", a total amount for each style calculated on the basis of the "unit prices" and the quantity involved, and a final total for the shipment. Added to the latter are an amount designated variously as "5 percent commission on export prices" or "5 percent on export prices" or "Buying Agent Commission" and an amount for "Stamps". The final total is designated "Total FOB Milano".

Entry was made by deducting from the total f. o. b. Milano figure the invoice items designated as "5 percent commission on export prices" or "5 percent on export prices" or "Buying Agent Commission" and "Stamps".

The red ink notation on a typical invoice reads:

APPRAISED AT INVOICE UNIT VALUES in column indicated, net, pkd.

The column checked is that headed "export prices".

Two official "Notice[s] of Action—Increase in Duties" were received in evidence as plaintiffs' collective exhibit 4. One states:

All entries dated from Aug. 9, 1960 until Aug. 7, 1963 from shipper Leon S. Sassoon of Italy, are appraised at export value, net, packed. "Buying Commission" considered part of appraised value.

The other refers to entries from July 18, 1960 until August 17, 1960 and contains similar language.

It also appears from certain manufacturers' invoices and special customs invoices that the "export prices" included the commission.

Plaintiffs-appellees are contesting only the inclusion of the "buying commission" in the appraised values.

■ Under established principles, an appealing party in a reappraisement proceeding may challenge any one or more of the items entering into an appraisement, while relying upon the presumption of correctness of the appraiser's return as to the other elements, whenever the challenged items do not bring into question the balance of the appraisement. United States v. Dan Brechner et al., 38 Cust. Ct. 719, A.R.D. 71, and cases cited; United States v. Gehrig, Hoban & Co., Inc., 54 CCPA 129, C.A.D. 924; United States v. Chadwick-Miller Importers, Inc., et al., 54 CCPA 93, C.A.D. 914; United States v. Bud Berman Sportswear, Inc., 55 CCPA 28, C.A.D. 929.

In the Gehrig, Hoban case, the court considered the record in connection with the manner in which the appraiser reached the appraised value. The commercial invoice showed an amount as the price f. o. b. New York, duty paid, discount of 15 percent included, and 15 percent of that amount equalled the disputed sum. Special customs invoices set out the f. o. b. price along with a breakdown, which included items listed as packing and agent's commission. It appeared from the red check marks on the invoices that the appraiser had utilized the breakdown and had found the value to be the invoiced unit value including the packing and agent's commission, less the other charges. The court said that the method by which the appraiser calculated value was not significant; that the invoices showed what he did. It quoted the following from the decision of the appellate term as to the requirements for application of the separability rule (56 Cust.Ct. 782, 790, A.R.D. 204):

A separate unit price for appraised merchandise must be shown, and the item in dispute must be one clearly identifiable as having been considered by the appraiser and as affecting dutiable value. * * *

■ In the instant case the evidence identifies the item in dispute as that designated on the invoices as "5 percent commission on export prices" or "5 percent on export prices" or "Buying Agent Commission" and the "Notice[s] of Action—Increase in Duties" show that it was an element in the appraised value. In the light of the Gehrig, Hoban case, we find that the appraisement is separable and that plaintiffs-appellees may rely upon the presumption of correctness attaching to the other elements of appraisement.

The issue before us is whether the trial court correctly determined that a bona fide buying agency existed, and that the 5 percent commission was not properly a part of the dutiable export value of the merchandise.

■ It is well settled, of course, that a bona fide buying commission, one which inures to the benefit of the purchaser, not the seller, is not part of the value of the merchandise. Stein v. United States, 1 Ct.Cust.Appls. 36, T.D. 31007; United States v. Case & Co.,

Inc., 13 Ct.Cust.Appls. 122, T.D. 40958; United States v. Dan Brechner et al., *supra;* Lollytogs, Ltd. v. United States, 55 Cust.Ct. 608, Reap.Dec. 11073. Whether a commission is a *bona fide* buying commission depends in each instance on the facts in the case, the burden of proof resting upon the plaintiff. Haddad & Sons, Inc. v. United States, 53 Cust.Ct. 423, Reap.Dec. 10825.

In the instant case the question concerns the relationship between the importer, Knit Wits, represented by Larry Taylor, president, and the so-called Sassoon group, consisting of Leon S. Sassoon, his son Ezra Sassoon, and his stepson Selim Haiatt. It appears from the record that the relationship had its inception in a contact between Taylor and Haiatt in Japan in 1956 and a subsequent visit by Taylor to Italy in 1957, at which time the Sassoons took him to a number of knitwear factories. Development of a business relationship was discussed and it was assumed that the Sassoons would act as agents for the Taylor interests.

This understanding was reduced to writing in December 1958, through a letter of Leon S. Sassoon (exhibit 2) which included the following:

1. You have nominated us as your exclusive Buying Agents for Italy working on 5% (Five percent) commission basis for all direct or indirect orders that you will place in Italy.

Mr. Taylor testified that he accepted the terms of this letter except paragraph 6, which related to the method of invoicing and paying the commission, and that all shipments were made according to the understanding set forth in the letter.

Mr. Taylor further testified that he traveled to Italy about three or four times a year and placed orders personally with the factories. On those occasions, he wrote down the size, color, style, and number of pieces desired and Ezra Sassoon, who served as interpreter, prepared formal contracts between the factory and Mr. Taylor. Taylor stated that he dealt with the individual factories and that Sassoon acted only as his agent on a 5 percent commission basis.

It appears from the testimony of Mr. Taylor and an affidavit of Ezra Sassoon (exhibit 1) that Sassoon acted as interpreter when Taylor visited the factories in Italy and the Sassoon firm placed orders with the mills on instructions from Taylor, made inspections of the merchandise before it was shipped to make certain that it conformed to the samples, and prepared the Special Customs Invoices. Mr. Sassoon stated that at no time did he or his firm act as independent sellers in dealing with Knit Wits. He explained:

* * * I always made sure that the mills understood that the purchaser in all cases was Knit Wits in California because we could not take the risk of being responsible for any refusal of the goods on the part of Knit Wits merely on a 5% commission. * * *

He stated that the earlier invoices showed Leon S. Sassoon as the seller because it was his understanding from information received at the American Consulate that the name of the one who was making out the invoice was to be shown as the seller. He was later instructed by Knit Wits to show the particular manufacturer as the seller.

In a letter dated February 8, 1962 (exhibit 3), Ezra Sassoon, after referring to delays in shipments, his firm's efforts to expedite them, and expenses incurred, stated:

* * * We are not working with you like traders with a profit permitting us to support all these changes, but we are working as your agents on a commission basis, and we cannot support any debit in any case. * * *

While this evidence manifests a principal-agent relationship between Knit Wits and the Sassoons, there is other evidence tending to indicate some confusion on the part of the Sassoon group as to their relationship with Knit Wits.

In a report of Customs Representative Edward L. Hughes dated April 12, 1961

(a part of collective exhibit F), it is stated:

> Mr. Sassoon said that it was agreed with Knit Wits that he would receive a commission of 5 percent of the F.O.B. packed invoice values on these shipments for transmitting the orders, inspecting the merchandise, and handling payments to the manufacturers, the commission to be included in the manufacturers' sales prices to Knit Wits.

At the time of my first visit, Mr. Sassoon was in some doubt concerning the nature of the 5 percent commission, and at that time he said he believed his part in the transaction was that of purchaser from the manufacturer and seller to Knit Wits at a fixed profit of 5 percent. On March 23, however, he said that he had been informed by Knit Wits he is acting as their buying agent. The confusion arose in part from the invoicing and remittance arrangements, because two of the manufacturers invoice to Knit Wits, while the other, Donato Faini & Figli, invoices to Leon Sassoon, Milan, or Leon Sassoon, Panama. All of the manufacturers show the full price on the invoices and Lorenzo Marelli also shows a discount of 5 percent. The manufacturers send the invoices to Mr. Sassoon and he forwards them to Knit Wits for Men. Payment of the full invoice amounts is made by Knit Wits for Men to Mr. Sassoon, who deducts 5 percent from the remittances and pays the balance to the manufacturers.

At that time, Mr. Sassoon produced records showing that the invoiced amounts shown on the invoices were paid by letters of credit and that he remitted these amounts, less 5 percent commission, to the manufacturers.

In a letter from Selim Haiatt, dated February 27, 1959 (exhibit D), it is stated:

> Then, you have sent us YOUR sample to be reproduced: the sweater in Cotton. This is the famous 1500 dozen order which has been finally reduced to 700 doz. while our commission on this business has been taken away on your insisting in having us "your buying agents" to support the air charges between New York and Los Angeles.

> \* \* \* \* \* \*

> Regarding our commission of 5% I think there is some misunderstanding. In fact we have never asked from you an extra commission of 5%. In principle, our commission of 5% is being paid to us by our manufacturers. Since the very beginning, I wanted to be frank and sincere with you by informing you what commission rate I was charging you, in order to help you in developing [sic] business on this market. I could have charged you 10% or 30% on some articles, the volume business might become smaller but my profit would have been just the same, with much less work, headaches, expenses, etc. to me, and without introducing you to my manufacturers.

> \* \* \* \* \* \*

> If we are to be renumerated [sic] by you and as your "agents" this means that in case you do not make enough business during a year, you are to provide for our office expenses and for the renumeration [sic] of our efforts. Therefore, it will be same as your office in Osaka. Therefore, as long as we will be receiving from our manufacturers our commission on the business placed with them, and without any guarantee from your part of the business volume per year to cover our expenses and our work, we remain the manufacturers' agents, nothing more.

Mr. Taylor testified that at the time he received the above letter he had not placed any orders for knitwear from Italy; that he did not act in accordance with the statements made in the letter which were contrary to the initial letter, and that when he subsequently placed orders he did not deal with the Sassoons as sellers.

Customs Representative Hughes stated in a report dated August 18, 1961 (part of collective exhibit F) that Ezra Sassoon said in reference to the above letter that

the letter was written at the beginning of the firm's relationship with Knit Wits when some costly mistakes were made and that its purpose was to convince the importer that he was not letting Sassoon make any money on the business. Mr. Sassoon said that the statements in the letter to the effect that the manufacturer paid the commission were incorrect; that the manufacturer did not pay Sassoon, and that the invoices and records of payment showed the nature of the commission.

It also appears from the record that one of the manufacturers, Donato Faini & Figli, had an exclusive sales arrangement with someone in New York, and that as a means of getting around the agreement, the merchandise was invoiced to Sassoon in Panama, although it was in fact shipped to Knit Wits in Los Angeles. It also appears from the report of Customs Representative Hughes, dated August 18, 1961, that the Sassoons received an additional commission of 2 percent from Donato Faini & Figli.

We are in accord with the trial court that the record is confusing and somewhat contradictory, but, viewed as a whole, we find that the record contains sufficient indicia from which it can be determined that the Sassoon group acted as buying agent for Knit Wits; that it was not an independent seller, and that it did not represent the manufacturers. United States v. Gitkin Co., 46 Cust.Ct. 788, A.R.D. 132; Lollytogs, Ltd. v. United States, *supra*. The duties performed by the Sassoons were those usually performed by buying agents. Mr. Taylor, representing the purchaser, acted as principal, visited the factories personally three or four times a year, negotiated with them for the merchandise and knew from whom he was purchasing. While the 5 percent commission was included in the export price by the manufacturers, there is no evidence that it inured to the benefit of the sellers. It never was paid

to them but was retained by the Sassoons.

Appellant claims that even if the Sassoons were buying agents, the evidence is not sufficient to show what the commission actually was, citing Sharwell Bros. Shoe Co. et al. v. United States, 59 Cust.Ct. 731, R.D. 11386, aff'd 61 Cust.Ct., A.R.D. 244. In that case the witness said the commission was based on any merchandise shipped to Sharwell through Kohyei; that it was not 5 percent of a purchase price or any specific price, and that he left it up to Kohyei to calculate it. He said there was an oral understanding that Kohyei was to get 5 percent of the total c. i. f. price, but he was unable to explain how it was possible to include the commission in the c. i. f. price and yet find that it constituted 5 percent of that c. i. f. price.

In the instant case the record establishes that the commission was figured by taking the unit price and dividing it by 95 to arrive at the export price. The difference was the commission, which was equal to 5 percent of the export value, but slightly more than 5 percent of the unit price. While this may be an unusual method of determining the amount of a commission, there is no difficulty here in finding in each instance what the amount of the commission was. While it appears that the Sassoons received an additional 2 percent from one of the manufacturers, this was not an element in the transaction between the manufacturers and the purchaser and does not controvert the fact that the 5 percent commission here in issue was a buying commission not part of dutiable value. Lollytogs, Ltd. v. United States, *supra*.

Accordingly, we affirm the decision and judgment of the trial court and incorporate by reference its findings of fact and conclusions of law.

Judgment will be entered accordingly.