## INTERNATIONAL FASHIONS

v.

## UNITED STATES.

### Court No. 74–10–02730.

United States Customs Court.

Mar. 17, 1976.

Glad, Tuttle & White, Los Angeles, Cal. (Edward N. Glad, Los Angeles, Cal., of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Velta A. Melnbrencis, New York City, trial atty.), for defendant.

RICHARDSON, Judge:

The merchandise in this case consists of ladies' acrylic knitted sweaters and boucle capes which were manufactured in Hong Kong, exported therefrom in August, 1971, and entered at the port of Los Angeles, California. In issue here is the proper appraised export value as that value is defined in 19 U.S.C.A., section 1401a(b) * (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956).

Plaintiff contends in this action that the proper export values are the f.o.b. invoice unit values, net packed, without the addition of 5 per cent as reflected in the appraiser's return of value. The record shows that the 5 per cent was added in the appraisement upon the advice of a customs agency report which indicated that there was an additional 5 per cent paid as an inspection fee that was not shown in the invoices. But it appears that the appraiser did accept the invoice unit values as the starting point in making the appraisement in issue.

Plaintiff acknowledges the payment of an additional 5 per cent in connection with the purchase and exportation of the involved merchandise, but alleges that the payment represents a commission that was paid for an inspection performed after the merchandise was in a condition packed ready for shipment to the United States [complaint, paragraph 7]. However, the evidence in the case, while it indicates that the disputed pay-

---

* Section 1401a(b) states:

For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

ment was initiated by the plaintiff, also indicates that the payment was for inspection services performed before the merchandise was in a condition packed ready for exportation to the United States.

The services for which the 5 per cent payment was made was described in the testimony of William Feldstein, Jr., plaintiff's owner and president since 1967. Mr. Feldstein testified on direct examination (R. 21–23):

Q. I would like to refer you to the entries in this particular case and ask you if you are familiar with these importations?—A. I am.

Q. How are you familiar with these importations?—A. They pertain to merchandise which I ordered and also pertain to order numbers which belong to my firm and relative letters of credit issued and guaranteed by me individually.

Q. From what manufacturer were these items of wearing apparel purchased?—A. Sincere's Knitting Factory.

Q. Did you have anybody making 100 percent inspection of these garments?—A. Yes.

Q. Whom did you have make 100 percent inspection of these garments? —A. A gentleman by the name of Mr. James Cheung.

Q. What arrangement did you have with Mr. James Cheung?—A. My arrangement with Mr. James Cheung was as follows: after I ordered the merchandise I asked him to inspect all of my yarns to make sure that I was not receiving uneven yarn from the finisher who I contracted for the yarn. After the pieces were knitted I asked that he inspect all the knitted bundles to make sure that the amount of yarn that was sent to the knitters came back into the knitted piece and that I was receiving precisely what I wanted. After that he supervised a team of people to inspect all the knitted pieces to make sure that the various sizes and specifications that I had required

were proper prior to the time the garments were finished. And in conclusion, or at the conclusion of these particular orders, he would, not "would," but he did inspect the merchandise in its entirety.

Q. How did you pay for this merchandise?—A. I paid for the merchandise through letter of credit.

And it was also brought out in the direct testimony of the witness that the letters of credit issued to Sincere's Knitting Factory and received in evidence as collective exhibit 1 were required to be cashed, among other things, against an inspection certificate signed by Mr. Cheung.

Payment for the inspection services was made separate and apart from payment for the merchandise *per se.* In this connection the affidavit of James Cheung, managing director of Sincere's Knitting Factory, Kowloon, Hong Kong, dated March 13, 1975, and received in evidence as exhibit 2, states:

That my firm was paid by Letters of Credit made out to Sincere's Knitting Factory for the merchandise it sold to International Fashions. However, the payment to me of the 5% commission for the 100% inspection was made by checks in response to separate debit notes which I submitted every six to nine months to International Fashion, a photostatic copy of my last debit note to International fashion with the check received by me in payment, along with the receipt, are attached hereto. I only did this 100% inspection for International Fashion.

That I never considered the 5% commission payments from International Fashion as part of Sincere's Knitting Factory's profit. These payments were never made a part of Sincere's Knitting Factory's record. These payments were used by me to pay the persons that I had to hire to do this 100% inspection. In addition, I and not the factory signed the inspection certificates.

The Cheung affidavit also avers, among other things, that the factory employed around 250 workers and sold to buyers in the United States, Canada, Australia, and Europe, and that during 1971 prices charged by the factory were the same for comparable merchandise to all importers who purchased from the factory.

In its brief plaintiff argues that the appraisement is separable so as to permit challenge of only the inspection fee; and that since this fee is in the nature of a buying commission, it is not part of the dutiable value. Defendant argues that the appraisement is not separable, but that even if it is separable the separability doctrine is not available since plaintiff failed to prove that the merchandise was freely sold or offered for sale to all purchasers for exportation to the United States at prices which did not include the disputed fee. Defendant also argues that plaintiff failed to establish that the disputed charge is not part of the price of the merchandise.

Although the doctrine of separability extends to cases such as that at bar where the appraisement involves an f.o.b. price rather than an ex-factory price, see *United States v. Knit Wits (Wiley) et al.,* 62 Cust. Ct. 1008, A.R.D. 251, 296 F.Supp. 949 (1969), the application of the doctrine is conditioned upon a showing that the merchandise is freely sold or offered for sale to all purchasers for exportation to the United States at a price which does not include the disputed item or items. *United States v. Pan American Import Corp. et al.,* C.A.D. 993, 428 F.2d 848, 57 CCPA 134 (1970). Bearing in mind that the imported merchandise in this case involves "quality controlled" knitwear, the only evidence in the record as to prices for merchandise other than that imported herein is the aforementioned statement in the Cheung affidavit. And the court agrees with defendant that this statement does not constitute evidence of statutory export value equal to invoice unit prices which do not include inspection charges, or without a separate payment for inspection charges.

In fact, if the term "comparable merchandise" in the Cheung affidavit can be said to be the equivalent of the quality controlled knitwear involved in this case, it would appear, according to the Cheung affidavit, that other sales of such merchandise involved an additional inspection charge. In this connection the Cheung affidavit states:

That Sincere's Knitting Factory had its own inspectors in the packing and finishing department who would random inspect the merchandise being shipped to all of its customers, including International Fashions. But then I would have these six to twelve persons do the 100% inspection which is *similar to the inspection that the agents of my other customers would do.* [Emphasis added.]

And again the Cheung affidavit states:

That when these inspectors [the Cheung appointed inspectors] found any defects in the merchandise, they would return the defective garment to the factory to either be fixed or replaced *in the same manner that agents for our other customers would do.* [Emphasis added.]

Hence, under the circumstances disclosed in this case, the absence of evidence of other sales or offers of such merchandise, i. e., "quality controlled" knitwear, at prices other than the appraised values, bars application of the separability principle here.

Moreover, even if plaintiff had established the requisite export sales or offers, paving the way for application of the separability principle in this case, the testimony of the witness Feldstein noted hereinbefore would preclude any treatment of the disputed charge, irrespective of to whom paid, as nondutiable. Section 1401a(b) plainly includes expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States, when not included in the price *per se.* And the services outlined in the Feldstein testimony for which the disputed charge was incurred clearly fall within this category. As

such, the court would be obliged in any event to sustain defendant's alternative argument, to wit, that plaintiff was failed to establish the non-dutiability of the charge.

Nor is plaintiff's case saved by calling the charge in question a buying commission as counsel seem inclined to do in their brief. Apart from the fact that plaintiff's posture in its pleading precludes designation of the disputed item as anything but an inspection commission, a buying commission is different from, and, therefore, incompatible with the charge under consideration in this case. A buying commission is associated with and affects the *manner* in which foreign merchandise is purchased for exportation, whereas the inspection commission at bar is associated with and affects the *nature* of the foreign merchandise which is purchased for exportation, i. e., the presence or absence of the charge determines whether the foreign merchandise is "quality controlled" merchandise, or whether it is non-quality controlled merchandise.

For the reasons stated plaintiff has failed to sustain the issuable allegations of the complaint. Accordingly, the court finds as facts:

1. That the merchandise in this action consists of "Quality controlled" ladies' acrylic knitted sweaters and boucle capes manufactured in Hong Kong by Sincere's Knitting Factory and exported therefrom in August, 1971.

2. That said merchandise was appraised upon entry at the port of Los Angeles, California, on the basis of export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) at the invoiced f.o.b. unit prices plus 5 per cent.

3. That there is no evidence in the record that at the time of exportation of said merchandise such or similar merchandise was freely sold or, in the absence of sales, offered for sale to all purchasers in the principal markets of Hong Kong in the usual wholesale quantities for exportation to the United States at the invoiced f.o.b. unit prices.

Upon these facts the court concludes as matters of law:

1. That export value as defined in 19 U.S.C.A., section 1401a(b) (section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956) is the proper basis for determination of the value of the merchandise herein.

2. That plaintiff has not established an export value different from that returned in the appraisement of said merchandise.

3. That the appraised values of said merchandise remain in full force and effect by reason of plaintiff's failure to overcome the presumption of correctness attaching to the appraisement.

Judgment will be entered herein accordingly.