**NEW TRENDS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 81–4–00465.

United States Court of
International Trade.

Sept. 29, 1986.

Johnson, Johnson & Johnson (Ralph Perry-Miller, Dallas, Tex., at the trial and on the brief), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch (Judith M. Barzilay, New York City, at the trial and on the brief), for defendant.

## MEMORANDUM OPINION AND ORDER

RE, Chief Judge:

The question presented in this case pertains to the proper valuation, for customs duty purposes, of certain giftware, furniture, and decorative accessories of bamboo, rattan, and other fibrous materials imported from the Philippines, Hong Kong, Japan, and Taiwan.

The Customs Service appraised the merchandise on the basis of export value, in accordance with section 402(b) of the Tariff Act of 1930, 19 U.S.C. § 1401a(b) (1976) (amended 1979).

> The Tariff Act defines export value as: the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Tariff Act of 1930 § 402(b), 19 U.S.C. § 1401a(b) (1976) (amended 1979).

The parties agree that the export value is the proper basis for valuation. *See* 19 U.S.C. § 1401a(b). Plaintiff, however, contends that the export value of the merchandise improperly included bona fide buying commissions paid to its overseas agents. Defendant contends that "the alleged 'agents' were actually the sellers of the merchandise, and New Trends' agency agreements were sham agreements designed to avoid the payment of duties."

The question presented is whether certain buying commissions, included by the Customs Service in determining the dutiable value of the merchandise, were bona fide commissions paid to plaintiff's agents. If the amounts were bona fide commissions, they were not a proper element of dutiable value, and should not have been included. *See, e.g., United States v. Nelson Bead Co.,* 42 CCPA 175, 183, C.A.D. 590 (1955); *Oriental Exporters, Inc. v. United States,* 4 CIT 1, 3 (1982); *J.C. Penney Purchasing Corp. v. United States,* 80 Cust.Ct. 84, 95, C.D. 4741, 451 F.Supp. 973, 982 (1978).

After careful examination of the evidence adduced at trial, the arguments of the parties, and the relevant case law, it is the determination of the Court that plaintiff has not overcome the presumption of correctness which attaches to the government's determinations of dutiable value. *See* 28 U.S.C. § 2639(a)(1) (1982); *Diamex Hawaii, Ltd. v. United States,* 4 CIT 162, 165–66 (1982). Therefore, the valuation of the imported merchandise by the Customs Service is affirmed.

At trial, numerous exhibits were entered by the parties, and the Court heard the testimony of the plaintiff's sole witness, Mr. Robert Edward Parker, owner of New Trends, Incorporated. On direct examination, Mr. Parker testified that New Trends obtained a wide range of merchandise from approximately 300 manufacturers located throughout the Far East.

Mr. Parker asserted that New Trends had the capability to deal directly with the manufacturers. Nevertheless, he testified that New Trends employed the services of 10 overseas buying agents, who were to be

paid 10 percent of the ex-factory price of the imported merchandise.

Mr. Parker testified that once a product design was conceived by New Trends, it was forwarded to an agent who located manufacturers capable of producing the desired merchandise. Mr. Parker would then travel to the Far East to examine samples of the merchandise, and would negotiate directly with the foreign manufacturers, who were frequently local villagers who worked at their homes. Mr. Parker stated that the agents lacked authority to bargain on behalf of New Trends, and that their function was limited to arranging the meetings and, at times, serving as interpreters.

After a price was agreed upon with the manufacturer, New Trends would forward a purchasing order together with a letter of credit, payable to the agent, who proceeded with the transaction with the manufacturer. Although it was "customary" to prepare the documentary transactions in the name of the agent, Mr. Parker testified that it was beyond the authority of the agent to purchase on behalf of New Trends without express instructions.

Mr. Parker further testified that it was the responsibility of the agent to prepare the merchandise for shipment, and that the agent would bear the cost of shipping preparations. He added that New Trends preserved the right to pursue claims against its agents for defective or damaged merchandise. If a claim arose, New Trends would either delay disbursement of the funds set aside for the letter of credit until the claim was settled by the agent, or New Trends would reduce the amount paid to the agent. Mr. Parker assumed that the agent was reimbursed for these claims by the manufacturer, yet, he could neither substantiate nor support this assumption with testimony or documentation. Nor could Mr. Parker substantiate that the agent actually paid the negotiated price to the manufacturer since the letters of credit were made payable to the agent.

The record discloses that an employee of New Trends, in response to a questionnaire submitted by Customs, admitted that: (1) New Trends did not specify the manufacturers or factories from which the agent was to make purchases; (2) New Trends could not purchase the merchandise directly from the manufacturer; (3) New Trends bought only F.O.B. from the buying agent; (4) New Trends did not participate in negotiations, and the agent conducted all negotiations with the factories while New Trends dealt only with the agent; (5) New Trends did not know if the manufacturers were aware that New Trends was the actual purchaser; and (6) New Trends did not know how much the agent paid the manufacturers for the merchandise.

Mr. Parker attempted to refute this document, and testified that the employee who prepared it had no authority to answer Customs' request for information. Defendant, however, introduced a letter which indicated that, at the time, the employee was the Import Manager for New Trends. Mr. Parker denied that the employee had ever held the position of Import Manager for New Trends.

Defendant introduced into evidence documentary exhibits consisting of the purported agents' letterheads, commercial invoices, and customs' invoices in which the agents designated themselves as "sellers" and "manufacturers." Mr. Parker suggested that the designation was a misnomer because these specific agents were financially incapable of functioning as selling companies. He added that it was the custom of Far Eastern business persons to characterize themselves as sellers.

Plaintiff contends that the evidence adduced at trial confirms the principal-agency relationship exhibited in the buying agency agreement. Plaintiff asserts that New Trends exerted the degree of control over its overseas agents necessary to establish an agency relationship. Plaintiff also maintains that the record establishes that the commissions paid to the agents inured solely to the benefit of New Trends and not to the manufacturers.

It is the determination of the Court that plaintiff's evidence is not sufficient to support its contention that a bona fide princi-

pal-agency relationship existed between New Trends and its overseas agents.

■ It is fundamental that a buying commission paid to a bona fide agent of the importer is not a proper element of dutiable value. *See United States v. Nelson Bead Co.*, 42 CCPA 175, 183, C.A.D. 590 (1955); *J.C. Penney Purchasing Corp. v. United States*, 80 Cust.Ct. 84, 95, C.D. 4741, 451 F.Supp. 973, 982 (1978). The existence of a bona fide agency relationship, however, is not determined by any single factor. Whether a buying commission is bona fide depends upon the relevant facts of each case. *E.g., Oriental Exporters, Inc. v. United States*, 4 CIT 1, 1–3 (1982); *J.C. Penney* 80 Cust.Ct. at 95–102, 451 F.Supp. at 983–88.

■ It is not questioned that plaintiff has the burden of proof as to the existence of a bona fide agency relationship. *See, e.g., B & W Wholesale Co. v. United States*, 58 CCPA 92, 97, C.A.D. 1010, 436 F.2d 1399, 1403 (1971). On this important issue, it has been stated that "if the existence of an agency relationship is not clearly established, the legal relationship is not that of agency." *Globemaster Midwest, Inc. v. United States*, 67 Cust.Ct. 539, 545, R.D. 11758, 337 F.Supp. 465, 469 (1971). The essence of an agency relationship is the exercise of control by the principal over the conduct of the agent as to those matters entrusted to the agent's care. *See Globemaster Midwest, Inc. v. United States*, 67 Cust.Ct. 539, 546, R.D. 11758, 337 F.Supp. 465, 470 (1971) (citing *Restatement (Second) of Agency* §§ 1 comment b, 14 comment b (1958)).

Plaintiff relies upon *J.C. Penney Purchasing Corp. v. United States*, 80 Cust.Ct. 84, C.D. 4741, 451 F.Supp. 973 (1978), to support its contention that New Trends exhibited the requisite control over its agents to establish a bona-fide agency relationship. In the *J.C. Penney* case, the importer contended that the Customs Service, in determining dutiable value, improperly included commissions paid to the importer's buying agent. Defendant asserted that since the importer lacked control over

the agent's actions, there was no principal-agency relationship. The court held that a principal-agency relationship existed, and stated that the evidence presented revealed the active role taken by the importer throughout the transactions in question. *Id.* at 95, 451 F.Supp. at 983. The court noted certain significant factors that were illustrative of the importer's active role and control. These factors included the importer's frequent visits to the Far Eastern factories where the goods were produced, his direct negotiations with manufacturers as to price and shipping specifications, the manufacturers' awareness that the importer was the ultimate purchaser, and the lack of any discretion, on the part of the agent, as to the purchasing of the merchandise. *Id.* at 95–96, 451 F.Supp. at 983–84.

Unlike the *J.C. Penney* case, the record in this case does not reveal a similar active role and control on the part of New Trends. In the *J.C. Penney* case the evidence was deemed sufficient to overcome the presumption of correctness that attaches to the government's determinations of dutiable value. In this case, the evidence shows that the agents were granted a great deal of discretion and authority throughout the entire purchasing process. Although Mr. Parker testified that he was intricately involved in the negotiations with the Far Eastern manufacturers, he was unable to recall any of the names of the manufacturers who were involved in the direct negotiations. Indeed, the record makes clear that New Trends had very little to do with the purchasing process once the price was established. As an example, it may be stated that New Trends gave no instructions specifying the manner in which the goods were to be handled or shipped. Not only were the agents fully responsible for these matters, but they were also required to absorb the cost of shipping and handling as part of their commissions.

■ Control, however, is but one factor which indicates the presence of a principal-agency relationship. *See Mathews Conveyor Co. v. Palmer-Bee Co.*, 135 F.2d 73, 81 (6th Cir.1943). It has been recognized

that "[o]ne may submit to a degree of control by another without being an agent ..." *Id.; see Griffin v. United States*, 521 F.2d 521, 528 (5th Cir.1979). If an agent is to acquire property and deliver it to a principal, an agency exists only if the agent acts primarily for the benefit of the principal and not for himself. *Restatement (Second) of Agency* § 14K. The *Restatement (Second) of Agency* sets forth several factors which indicate that there was no agency relationship in the case at bar. It is noted that the following factors are inconsistent with an agency relationship:

(1) That [the agent] is to receive a fixed price for the property, irrespective of the price paid by him.... (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property.

*Restatement (Second) of Agency* § 14K comment a. The agent's liability for lost or damaged goods would also tend to indicate a sale rather than an agency. *See* W. Seavey, *Handbook of the Law of Agency* 23 (1964).

Careful examination of the evidence of record reveals that the alleged buying agents did not act primarily for the benefit of New Trends. On the contrary, the credible evidence negates the existence of a bona fide agency relationship. As an example, reference may be made to the manner of payment, which was left to the discretion of the alleged buying agents. The letters of credit issued by New Trends were made payable to the agents. From these letters of credit, the agent was to deduct his commission and then forward the negotiated price to the manufacturer. Mr. Parker, however, could not substantiate this method of payment to the manufacturers either by oral testimony or by documentary evidence. The failure to produce documentary evidence of a transaction which is normally reduced to writing, and that would be indicative of agency status weakens the probative value of the attempted explanation offered by Mr. Parker. *See A & A Trading Corp. v. United States*, 65 Cust.Ct. 785, 791–92, A.R.D. 276 (1970).

The evidence also reveals that the so-called agents conducted independent businesses. Customs invoices entered into evidence expressly designated several of the alleged agents as "sellers" of the imported goods. The commercial invoices of the alleged agents designated the agents as "manufacturers" and "producers" of goods. In addition, correspondence between the "agents" and New Trends often characterized New Trends as the "purchaser" of goods "sold" by the "agents." This language or terminology has been held to be inconsistent with the existence of an agent-principal relationship. *See Globemaster Midwest, Inc. v. United States*, 67 Cust.Ct. 538, 545, R.D. 11258, 337 F.Supp. 465, 470 (1971); *A & A Trading Corp. v. United States*, 65 Cust.Ct. 785, 790–91, A.R.D. 276 (1970).

In the *Globemaster* case, plaintiff contended that Customs' appraisement of imported merchandise improperly included the non-dutiable commissions paid to an overseas buying agent. Defendant argued that the buying agent was actually the seller of the merchandise and, therefore, the commissions were not bona fide. The court upheld the determination of Customs, and found the relationship between the importer and its alleged agent to be that of buyer and seller. 67 Cust.Ct. at 548, 337 F.Supp. at 472.

The court, in the *Globemaster* case, noted that the fact that the agent was designated on the Customs invoices as the "seller" of the imported goods was a factor which supported the conclusion that the "agent" was not a bona fide agent of the importer. The importer's attempts to refute or dispel the designations were rejected by the court, since an agent experienced in the trade was presumed to be aware of his true capacity in the transaction. Specifically, the court stated:

"Where the official papers accompanying an entry unequivocally set out a relationship between two parties which is

subsequently disclaimed by them, this court has looked askance at such later allegations in the absence of clear and convincing proof that the statements made at time of entry were erroneous." *Id.* at 345, 337 F.Supp. at 470 (quoting *United States v. Manhattan Novelty Corp.*, 63 Cust.Ct. 699, 704, A.R.D. 263 (1969)). Consequently, the court determined that the designation of the agent as a "seller" outweighed the existence of a written buying agency agreement. 67 Cust.Ct. at 545, 337 F.Supp. at 470.

Plaintiff, citing *Oriental Exporters, Inc. v. United States*, 4 CIT 1 (1982), contends that it was a common practice among buying agents to designate themselves as sellers or manufacturers. In the *Oriental Exporters* case, the designation of the agent as a seller did not defeat the agent's bona fide status. In that case, however, the evidence was clear and convincing. The designation was explained as a requirement imposed upon the parties by the importer's bank. *Id.* at 3. In this case, plaintiff's only explanation consisted of Mr. Parker's testimony that everybody in foreign countries "projects themselves as a manufacturer." This explanation is insufficient to rebut or refute the documents in evidence.

An additional indication that an agency relationship did not exist is plaintiff's preservation of a right to pursue claims against its agents. In effect, the buying agents bore the risk of loss for damaged, lost, or defective merchandise. In the *J.C. Penney* case, the court recognized that the risk of loss, which was not borne by the agent in that case, was a factor to be considered in determining the existence of an agency status. 80 Cust.Ct. at 100, 451 F.Supp. at 986. Documentary evidence confirms that New Trends exercised its right to assert damage claims against its agents by withholding the amount of the particular claim in its next letter of credit to an agent. Mr. Parker testified that the agent could then collect the claim from the manufacturer, hence, he could only assume that the manufacturer, and not the agent, was the "ultimate sufferor."

Another factor which supports an agency relationship is the agent's financial detachment from the manufacturers of the merchandise. *See J.C. Penney*, 80 Cust.Ct. at 97, 451 F.Supp. at 984; *Manhattan Novelty Corp. v. United States*, 68 Cust.Ct. 884, 885–86, R.D. 11648 (1969). Mr. Parker testified that he had no knowledge whether any of the agents' commissions inured to the benefit of the manufacturer. He was also unable to substantiate the distribution of the letters of credit issued to the agents. Hence, whether the commissions were shared or retained solely by the agents is not known, and one can only guess what were the actual facts. Furthermore, without any elaboration, Mr. Parker admitted his awareness of "kickback" arrangements between the agents and the manufacturers. It is clear that, on this record, complete financial detachment has not been established.

Finally, plaintiff contends that the existence of a contractual buying agency agreement is proof of a bona fide agency relationship. The cases cited in support of this contention mention the existence of a written agency agreement as an indication of an agency relationship. *See Oriental Exporters, Inc. v. United States*, 4 CIT 1, 2 (1982); *J.C. Penney Purchasing Corp. v. United States*, 80 Cust.Ct. 84, 98, C.D. 4741, 451 F.Supp. 973, 985 (1978); *Dorco Imports v. United States*, 67 Cust.Ct. 503, 512, R.D. 11753 (1971). In none of these cases, however, was the written agreement dispositive of the court's determination.

Although plaintiff contends that the inclusion of the buying commissions in the dutiable value was improper, it has failed to introduce sufficiently persuasive evidence to prove that the merchandise was improperly appraised by the Customs Service. Therefore, it is the determination of the Court that plaintiff has not rebutted the presumption of correctness that attaches to the appraisal by the Customs Service. Accordingly, the appraised values are affirmed, and the action is dismissed.