**JAY–ARR SLIMWEAR INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Court No. 85–01–00003.**

United States Court of International Trade.

Feb. 18, 1988.

Soller, Singer & Horn, Raymond F. Sullivan, Jr., New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, U.S. Dept. of Justice, Kenneth N. Wolf, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

TSOUCALAS, Judge:

This matter is before the Court, after trial, to determine whether certain payments representing commissions and consular fees were properly considered dutiable in the appraisement of the imported merchandise; and whether the imported merchandise consisting of brassieres with a lace edging, were properly classified as ornamented garments.

## BACKGROUND

At trial plaintiff produced two witnesses, the first of whom was Mr. Jack Rosenbaum, the president of Jay–Arr Slimwear. According to his testimony, plaintiff shipped precut fabric and accessories to Caribbean Contractors in Haiti to be assembled into the subject brassieres. Trial Transcript at 7–8 (hereinafter "Tr. at ——"). Plaintiff's other witness was Mr. Alain Turnier, the principal of Caribbean Contractors. Over fifteen years ago the two men established a business relationship, wherein Mr. Turnier's company would assemble plaintiff's goods. For each order shipped to Haiti, the two negotiated a price for assembly. Tr. at 8, 67.

In addition, Mr. Turnier agreed to act as plaintiff's representative in Haiti, for which he was compensated. As part of these special services rendered to plaintiff, Turnier secured enough quota for plaintiff's goods. Tr. at 13–15, 48. Turnier applied for quota (on behalf of Caribbean Contractors), which he distributed to his custom-

ers. Tr. at 76. Although Turnier did not have to pay for the quota directly, he had access to the quota allocation, Tr. at 15, 76, and was reimbursed for the "indirect" costs he incurred for this function. Tr. at 77. Turnier was also to expedite the release of plaintiff's goods from Haitian Customs and eliminate any interference in the import and re-export of plaintiff's goods from Haiti, such as minimizing the amount of time the plant was closed for a "work off"; [1] controlling stealing; and arranging for pick up of the merchandise upon importation. Tr. at 15, 48, 78. Mr. Turnier achieved these results by "speaking with the right people" in Haiti. The two witnesses testified that as a result of Mr. Turnier's previous experience as a commercial counsel at the Haitian Embassy in Washington, as Commerce and Finance Minister in Haiti, and as a well known business man in Haiti, he was able to exert influence in order to ease the way for the assembly of plaintiff's goods. Tr. at 11–13, 48–50, 66. Mr. Turnier was not given explicit instructions by plaintiff, but was advised of any problem and obtained the assistance of people in Haiti to avoid delays in the production of plaintiff's goods. Tr. at 49, 51.

The amounts to be paid Turnier were negotiated between he and Mr. Rosenbaum on a style by style basis, but equalled approximately one-third the cost of assembly. Tr. at 12, 20–21, 75. Plaintiff generated pro forma invoices representing these commissions; apparently separate from those invoices reflecting the transactions for the assembly, Tr. at 16–18, 20; and plaintiff issued checks to Mr. Turnier distinct from those issued to Caribbean Contractors. Tr. at 52–53. However, Turnier endorsed some of these payments over to Caribbean Contractors. *See* Plaintiff's Exhibits 2 and 3; Defendant's Exhibit A. Turnier explained that these were loans to his company to meet expenses. Tr. at 94.

As to the payment of consular fees, the Haitian government assesses this charge on goods entered for assembly, based on the value of the materials. The payment of these fees is a precondition to the release of the goods. Tr. at 101. Mr. Rosenbaum stated that plaintiff did not pay the consular fees, rather Caribbean Contractors made the payments, and would be reimbursed by plaintiff upon receipt of the invoices and consular receipts. Tr. at 42–44. However, there were instances where these charges were paid directly by plaintiff, Tr. at 100, and Mr. Turnier was of the opinion that payment was ultimately plaintiff's responsibility. Tr. 55–57, 80.

Finally, there was evidence adduced pertaining to one style of the imported brassieres, which was considered by Customs to be ornamented. This garment, represented by Plaintiff's Exhibit 7, has a strip of tiny scalloped lace, approximately three-eighths of an inch wide, trimming the top of the cup to cover the raw edge of rubber. Less than one-eighth of an inch of lace extends out from the edge of the cup. Some material was necessary to cover that edge and it was the designer's choice to use this fabric. Tr. at 24–25. Mr. Rosenbaum testified that the marketability of this style was not affected by the lace. Tr. at 26–28. Although of the opinion that in the industry, the lace would not be considered to have a decorative effect, Mr. Rosenbaum stated that the scalloping did serve a decorative purpose. Tr. at 28–29, 58.

## DISCUSSION

The merchandise was appraised on the basis of transaction value under § 402 of the Tariff Act of 1930, as amended (19 U.S.C. § 1401a (1982)). 19 U.S.C. § 1401a(b) provides:

(1) The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—

(A) the packing costs incurred by the buyer with respect to the imported merchandise;

---

**1.** Apparently, in Haiti the government could close down a plant based solely upon a labor complaint. Tr. at 13, 78.

(B) any selling commission incurred by the buyer with respect to the imported merchandise;

(C) the value, apportioned as appropriate, of any assist;

(D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and

(E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.

\* \* \* \* \* \*

(4)(A) the term "price actually paid or payable" means the total payment (whether direct or indirect, and exclusive of any costs, charges, or expenses incurred for transportation, insurance, and related services incident to the international shipment of the merchandise from the country of exportation to the place of importation in the United States) made, or to be made, for imported merchandise by the buyer to, or for the benefit of, the seller.

The amounts enumerated in subsection (b)(1) will be added to the price actually paid or payable only to the extent not already included in that price, and only if based on sufficient information. 19 U.S.C. § 1401a(b)(1).

The first issue is the dutiability of Turnier's commission. Plaintiff claims that the activities of Turnier, in exerting his influence on plaintiff's behalf in Haiti, are distinguishable from the mere assembly activities of Caribbean Contractors, Turnier's company. Defendant argues that Turnier and Caribbean Contractors are one and the same and the commissions are in fact part of the cost of the merchandise.

■ The nature of the services performed by the agent giving rise to the commission determines whether that cost should be included in the market value of the merchandise. A *bona fide* buying commission is exempt from dutiable value. *Rosenthal–Netter, Inc. v. United States*, 12 CIT ——, ——, 679 F.Supp. 21, 26 (1988)

(citing *United States v. Nelson Bead Co.*, 42 CCPA 175, 183, C.A.D. 590 (1955); *J.C. Penney Purchasing Corp. et al. v. United States*, 80 Cust.Ct. 84, 95, C.D. 4741, 451 F.Supp. 973, 982 (1978)). In comparison, selling commissions are included within the dutiable value. 19 U.S.C. § 1401a(b)(1)(B); *Dorf Int'l, Inc., et al. v. United States*, 61 Cust.Ct. 604, 611, A.R.D. 245, 291 F.Supp. 690, 695 (1968). The distinction is whether the expense is associated with selling or producing the merchandise, rather than some ministerial function in procuring the goods. *See Norco Sales Co. v. United States*, 65 Cust.Ct. 778, 782, R.D. 11732 (1970).

■ In assessing whether Turnier's commission should be included in the appraised value of the merchandise, the initial inquiry must focus on whether this fee was a *bona fide* buying commission. Plaintiff bears the burden of proof in establishing that this relationship was a *bona fide* buying agency and must demonstrate the non-dutiable nature of the commission. *B & W Wholesale Co. v. United States*, 58 CCPA 92, 97, C.A.D. 1010, 436 F.2d 1399, 1403 (1971); *Rosenthal–Netter*, 12 CIT at ——, *New Trends Inc. v. United States*, 10 CIT ——, ——, 645 F.Supp. 957, 960 (1986).

Examples of services which are characteristic of those rendered by a *bona fide* agent include: compiling market information, gathering samples, translating, placing orders based on the buyer's instructions, procuring the merchandise, assisting in factory negotiation, inspecting and packing the goods, and arranging for shipment and payment. *Bushnell Int'l, Inc. v. United States*, 60 CCPA 157, C.A.D. 1104, 477 F.2d 1402 (1973); *United States v. Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590 (1955); *J.C. Penney Purchasing Corp. et al. v. United States*, 80 Cust.Ct. 84, C.D. 4741, 451 F.Supp. 973 (1978); *United States v. Knit Wits (Wiley) et al.*, 62 Cust.Ct. 1008, A.R.D. 251 (1969); *Carolina Mfg. Co. v. United States*, 62 Cust.Ct. 850, R.D. 11640 (1969).

Regardless of how the parties characterize the relationship, whether a *bona fide*

agency exists is to be determined by examining the actual transaction. *Shalom Baby Wear, Inc. v. United States*, 62 Cust.Ct. 856, 864, R.D. 11641 (1969). Since the agent must represent the buyer only, *Nelson Bead*, 42 CCPA at 176, the agent's relationship with the seller or manufacturer is a critical factor to consider in determining whether a buying agency exists. Defendant contends that there has been no proof that Caribbean Contractors has a corporate existence, or is a separate entity from Turnier. The legitimacy of an agency relationship "may well be questioned when the so-called commissionaire and the manufacturer are under common control of members of the same family.... [C]ommon control exists where separate legal entities are in fact controlled by the same person or members of the same family." *Fine Arts Bag Co. v. United States*, 57 Cust.Ct. 625, 633, R.D. 11224 (1966) (citations omitted).

■ Turnier's ownership of Caribbean Contractors does not *per se* disqualify him as an actual buying agent. *See id.* at 636. However, there must be proof of his financial detachment from Caribbean Contractors, the manufacturer, in reference to the commissions paid. *New Trends*, 10 CIT at ——, 645 F.Supp. at 962; *Fine Arts Bag*, 57 Cust.Ct. at 636. If any of the commissions were retained directly or indirectly by the seller, then the *bona fides* of a buying agency are suspect. *Nelson Bead*, 42 CCPA at 176; *see also Park Avenue Imports v. United States*, 62 Cust.Ct. 1035, A.R.D. 255 (1969) (it is of no consequence that agent possesses a stock interest in manufacturing company provided parties are not in privity and no commissions inure to the manufacturer's benefit).

■ In this vein, the evidence does not conclusively prove that the commissions paid Turnier do not inure to the benefit of Caribbean Contractors. Defendant's Exhibit A illustrates that seven out of eighteen checks payable to Turnier were endorsed over to Caribbean Contractors. While Mr. Turnier explained that these were loans to his company, it has not been demonstrated that these payments are not

disguised amounts paid for the merchandise. Nevertheless, profits earned by an agent which may ultimately benefit the manufacturer is but one factor, which standing alone, does not bar exclusion of the commissions from the dutiable cost. *Bushnell*, 60 CCPA at 161, 477 F.2d at 1406. No single factor is determinative; the relationship must be judged by the entire factual situation. *J.C. Penney*, 80 Cust.Ct. at 95, 451 F.Supp. at 983; *Knit Wits*, 62 Cust.Ct. at 1011.

■ A primary consideration, however, in ascertaining whether this relationship is that of principal-agent, rather than buyer-seller, "is the right of the principal to control the conduct of the agent with respect to the matters entrusted to him." *Dorf*, 61 Cust.Ct. at 610, 291 F.Supp. at 694. The degree of discretion granted the agent is an important factor. *New Trends*, 10 CIT at ——, 645 F.Supp. at 960. Where the buyer exercises no control over the manner in which the agent performs his duties, a *bona fide* buying agency cannot be established. *B & W Wholesale*, 58 CCPA at 95–96, 436 F.2d at 1402.

■ On this point, plaintiff's proof clearly fails, as Mr. Rosenbaum testified that plaintiff exerted no control over Turnier, and he considered Turnier independent. Tr. at 51. Mr. Turnier was not given explicit directives. Rather, Mr. Rosenbaum merely explained his problem to Mr. Turnier, who, while expected to follow instructions issued by Mr. Rosenbaum, Tr. at 99–100, essentially, exercised total discretion in deciding how to best eliminate impediments to the release and manufacture of plaintiff's goods. Tr. at 61, 100. Based on the aforementioned factors, Turnier cannot be considered a *bona fide* buying agent.

■ Notwithstanding this conclusion, the question remains whether the commissions may nevertheless be considered exempt from the dutiable value of the goods. Commissions representing services associated with the actual production of the merchandise are a component of selling price and thus, dutiable. *Norco Sales Co. v. United States*, 65 Cust.Ct. 778, R.D. 11732

(1970). In *Norco*, the buyer's agent as well as the assembler's employees coordinated the various submanufacturing processes and arranged for delivery straight to the factory for packaging and assembly. The costs incurred for these services, labeled "handling commissions", were reimbursed by the buyer. Nonetheless, the court held that these were not typical of services performed on behalf of a buyer in reference to purchasing goods. Rather, these supervisory functions were costs related to the manufacture and assembly of the goods. 65 Cust.Ct. at 782–83.

Similarly, inspection commissions were considered part of the dutiable value of the goods where the agent was to inspect all component pieces at each stage of production. *International Fashions v. United States*, 76 Cust.Ct. 92, C.D. 4640 (1976), *aff'd* 64 CCPA 35, C.A.D. 1180, 545 F.2d 138 (1976). The presence of this charge indicated that the goods were quality controlled and therefore, these expenses were incidental to placing the merchandise in condition, packed ready for shipment to the United States. The court distinguished this payment, which affects the *nature* of the foreign merchandise purchased for exportation, from a buying commission, which is associated with and affects the *manner* in which foreign merchandise is purchased for exportation. 76 Cust.Ct. at 96; *compare Concord Electronics Corp. v. United States*, 85 Cust.Ct. 87, C.D. 4877 (1980) (inspection services, which were not of a quality control type relating to production, did not affect the non-dutiable status of *bona fide* buying commissions). Additionally, *International Fashions* has been interpreted to "stand[ ] for the proposition that a fee which *must* be paid by the importer is part of dutiable value." *J.C. Penney*, 80 Cust.Ct. at 99, 451 F.Supp. at 986. In comparison, commissions are not an integral part of the price of the goods where the transaction could occur without the intervention of the agent and without paying the commission. *Id.* at 100, 451 F.Supp. at 986.

The Court must conclude that the commissions paid were properly included in the transaction value of the merchandise. The results obtained by Turnier could not occur but for his intervention. Plaintiff would not be able to deal with the Haitian Customs, expedite the delivery of the goods to the assembly plant, or curtail the effects of a "work off". Although Turnier's services are more closely associated with the manner, rather than the nature, in which the goods are produced for exportation, *see International Fashions, supra;* the capacity in which he functioned more nearly resembles the supervisory duties exercised in the *Norco* case. Further, it is bothersome that the commissions were negotiated on a style by style basis, in the same manner the assembly costs were negotiated. Tr. at 84. When asked to explain an instance where one commission was four times the amount of another commission, Mr. Turnier testified that he did not perform any different services on those occasions to warrant the disparity. Tr. at 86–87. Viewing the totality of the circumstances, plaintiff has failed to overcome its evidentiary hurdle.

As to the inclusion of consular fees in the appraised value of the merchandise, plaintiff asserts that it merely reimbursed Caribbean Contractors for payments made to the Haitian government for consular fees. Plaintiff reasons that since these charges were paid to the Haitian government and not retained by the manufacturer, they are not a component of the price paid or payable for the merchandise.[2] The thrust of the parties' arguments focus on which entity actually paid the fees, and which party was ultimately responsible for payment. However, neither party discusses the nature of consular fees, which the Court considers to be determinative of the dutiability of this cost.

Broadly categorized, consular fees are charges paid to the consul in the country where the transaction in question

---

**2.** The Court does not find it necessary to address plaintiff's defensive argument that these fees do not constitute an assist, which pursuant to 19 U.S.C. § 1401a(b)(1)(C), would be included in the value of the goods.

occurred, for processing and verifying invoices. *International Commercial Co., Inc., et al. v. United States,* 26 Cust.Ct. 607, 623, Reap.Dec. 7980 (1951), *aff'd,* 28 Cust.Ct. 629, Reap.Dec. 8112 (1952). When paid to secure consular invoices necessary for export, these exactions resemble export taxes. 26 Cust.Ct. at 626. Exactions such as export taxes, which are assessed on the goods at the time of exportation are not part of the dutiable value of the merchandise. *Sternfeld v. United States,* 12 Ct. Cust.App. 172, T.D. 40065 (1924). However, where the tax accrues prior to exportation and is imposed on all sales, this amount is included for appraisement purposes. *United States v. Passavant,* 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644 (1898); *Sternfeld,* 12 Ct.Cust.App. at 173, 175.

The point in time when the charge is imposed is the crucial factor, since the main consideration is whether this is a cost of placing the goods in condition ready for shipment, which is a proper component of dutiable value. *International Commercial,* 28 Cust.Ct. at 636. Therefore, if the charge is assessed before or at the point of sale of the merchandise and is a component of the sales transaction, the amount is a necessary part of the dutiable value. *Passavant,* 169 U.S. at 22, 18 S.Ct. at 222; *Atlas Trading Co. v. United States,* 26 Cust.Ct. 652, 655, Reap.Dec. 7989 (1951). Yet, where the exaction is tied to the activity of exportation, and not of sale, the amount is excludable. *Sternfeld,* 12 Ct. Cust.App. at 173–74; *Atlas,* 26 Cust.Ct. at 655.

The government in Haiti apparently imposes this fee on all merchandise entering the country for assembly. It is of no consequence that the goods would ultimately be re-exported. *Passavant,* 169 U.S. 16, 18 S.Ct. 219 (tax imposed on all goods when sold in host country but remitted if goods exported constituted part of the market value of the goods); *Muser v. Magone,* 155 U.S. 240, 15 S.Ct. 77, 39 L.Ed. 135 (1894) (no distinction drawn on basis that the goods were manufactured in one place and processed in another before final exportation). The charge accrues when the components arrive in Haiti for assembly, and if not paid, the assembly process cannot commence. Thus, these fees are necessarily present at the point of sale and are to be included as part of the price paid or payable for the merchandise.

The final issue for resolution is the appropriate classification of style 5520 of the imported brassieres (Plaintiff's Exhibit 7). The merchandise was classified by Customs under item 376.24, TSUS:

Corsets, girdles, brassieres, and similar body-supporting garments for women and girls; ... all the foregoing of any materials:

Lace or net articles, whether or not ornamented, and other articles, ornamented .. 32% ad val.

Plaintiff alleges that the appropriate classification is under item 376.28, TSUS:

Corsets, girdles, brassieres, etc.

Other articles, not ornamented .. 18% ad val.

Headnote 3 to Schedule 3, TSUS, sets forth the relevant criteria for ornamentation:

3. (a) the term *"ornamented",* ... means fabrics and other articles of textile materials which are ornamented with—

\* \* \* \* \* \*

(iii) lace, netting, braid, fringe, edging, tucking, or trimming, or textile fabric.

*Gelmart Industries, Inc. v. United States,* 11 CIT ——, 655 F.Supp. 482 (1987) addressed the question of whether brassieres are ornamented as a result of lace edging. As this Court held:

The presence of lace per se does not constitute ornamentation. Rather, the application of a two step analysis set forth in *United States v. Endicott Johnson Corp.,* 67 CCPA 47, C.A.D. 1242, 617 F.2d 278 (1980), determines whether an article is ornamented for tariff purposes. The first question is: Does the addition of the feature impart no more than an incidental decorative effect? The second inquiry is whether the feature has a functionality which is primary to any ornamentive nature. An affirmative response to either results in a nonornamental classification, and resolution of the first inquiry may eliminate the necessity

of the second. 67 CCPA at 50, 617 F.2d at 281.

*Id.* at ——, 655 F.Supp. at 485. "Ornamentation has been construed to embrace that which enhances, embellishes, decorates, or adorns." *Id.* (citing *Blairmoor Knitwear Corp. v. United States*, 60 Cust.Ct. 388, 395, C.D. 3396, 284 F.Supp. 315, 320 (1968)).

In *Gelmart*, stretch material comprised the substance of each brassiere and scalloped lace extended approximately one half, to one inch, from beyond the end of the stretch material, trimming the edge of each cup. In that instance, the presence of the lace provided a sharp contrast to the stretch material or nylon composing the remainder of the garment; and the scalloped lace embellished and adorned the brassieres by adding eye appeal. *Gelmart*, 11 CIT at ——, 655 F.Supp. at 485.

▇ The garments here in issue contain lycra spandex and nylon backs, completely nylon cups, and edging, which is three-eighths of an inch wide and stitched to the upper edge of each cup. The majority of the trim overlaps the edge of the cup and is covered by two rows of stitches. The importer testified that some material was needed to cover the raw edge of the cup and this material was chosen by the designer.

"Congress [did not] intend that all ... [features] be per se ornamental unless proved to have a function. If the importer, by a preponderance of the evidence, proves any ornamentive aspects to be incidental, added proof of functionality is not mandated." *United States v. Endicott Johnson Corp.*, 67 CCPA 47, 50, C.A.D. 1242, 617 F.2d 278, 281 (1980). The focus is on the article itself and whether the addition of the lace makes the brassieres an ornamented garment. *Gelmart*, 11 CIT at ——, 655 F.Supp. at 485. The presence of this lace on these garments does not add eye appeal to the brassiere. While the lace is noticeable, it is not patently distinctive from the remainder of the article. *Id.* at ——, 655 F.Supp. at 486; *see Brittania Sportswear v. United States*, 5 CIT 212, 214 (1983) [Available on WESTLAW, 1983 WL 4998]. The presence of the lace does not provide a

sharp contrast to the remainder of the garment as was the case in *Gelmart*. To hold that this edging is more than incidentally decorative would nullify the proposition that the presence of lace per se does not constitute ornamentation. "The test for ornamentation is not whether the added fabric is necessary, ... nor is it per se ornamentation because a simpler fabric might have been used." *Gelmart*, 11 CIT at ——, 655 F.Supp. at 486 (citation omitted).

## CONCLUSION

Plaintiff has failed to establish that the commissions paid to Turnier, the owner of the plant which assembles plaintiff's goods, were non-dutiable. Turnier's activities are not consistent with those of a *bona fide* buying agent as he was not under the control of plaintiff and it is not clear that the payments did not benefit Caribbean Contractors. These commissions were part of the dutiable value of the merchandise, as Turnier's activities were an integral link in the production of plaintiff's goods. Furthermore, the consular fees which were assessed on goods entering Haiti for assembly were also properly included in the value of the goods, since this was an exaction imposed at or before the time of sale. Finally, as to classification of the imported merchandise, the addition of tiny scalloped edging to finish the cups of the brassieres does not make them ornamented garments. The presence of the lace is no more than incidentally decorative, thus, these garments should be classified under item 376.-28, TSUS. So ordered.