**ROSENTHAL–NETTER, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Nos. 83–5–00678, 83–6–00842.**

United States Court of International Trade.

Jan. 28, 1988.

Murray Sklaroff, New York City, for plaintiff.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, International Trade Field Office, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, (Michael P. Maxwell), New York City, for defendant.

## OPINION

TSOUCALAS, Judge:

These consolidated actions challenge Customs' appraisement of three entries of "rattanware." Plaintiff, importer, claimed the charges, denominated "buying commission" and "handling charges" in the appraised value, are *bona fide* buying commissions properly excludable from the dutiable value of the subject merchandise. Customs maintains that the entity paid the commissions and handling charges was not a *bona fide* agent of plaintiff but a seller of the merchandise. It is agreed that the proper basis of appraisal is export value [1] or transaction value as defined in § 402(b) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, (19 U.S.C. § 1401a(b) (1982)). Thus, the sole issue presented is whether a *bona fide* agency relationship existed between plaintiff and its intermediary.

### *Trial*

At the trial of this action, two witnesses testified on behalf of plaintiff: Mr. Alvin L. Rosenthal, co-founder and former President of Rosenthal–Netter, Inc., and Mr. Wong Tai Choi (hereinafter "Mr. Wong"),

founder and owner of Hongson Arts Company, the alleged buying agent in Hong Kong. Defendant produced Mr. Paul Garretto, a National Import Specialist for the United States Customs Service as an expert witness.

Mr. Rosenthal testified that he began purchasing and importing "rattanware" directly from the People's Republic of China (hereinafter "PRC") in 1974. However, Mr. Garretto contradicted plaintiff's assertions by testifying that between the years 1975 and 1978, it was not credible that anyone could buy or ship merchandise directly from the PRC without the use of an intermediary. He further stated that the banking systems were not set up for a United States buyer to purchase directly from the PRC.

The parties stipulated that Mr. Rosenthal attended the biannual Commodities Fair with Mr. Wong in Canton, China. Mr. Rosenthal added that even though he could have purchased the goods directly from the suppliers at the Fair, he chose to enter into an oral agency agreement with Hongson in 1975. This agreement was allegedly reduced to writing one year later on September 28, 1976.

Mr. Wong's duties as an agent were allegedly to obtain samples, place orders, and speak with the PRC trading companies. Mr. Wong also was to receive the subject merchandise in Hong Kong, transport it to his warehouse, unpack the goods, check the markings, check for damage, maintain quality control, consolidate the merchandise for shipping, and then ship the merchandise to plaintiff. Trial Transcript at 26–27 (hereinafter "Tr. at ___"). Mr. Wong was authorized to negotiate with the freight companies with respect to price and as to what steamship line to use. In exchange for these services, Mr. Wong received a "5% Commission" and a "10% Handling Charge."

Mr. Wong testified that he traveled to the PRC nearly every week on behalf of

---

**1.** One of the entries of rattanware was appraised on the basis of export value as defined in § 402(b) of the Tariff Act of 1930, as amend-

ed by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b) (1976)).

plaintiff and that plaintiff made the final selection as to quality, price and style. He further testified that the agency agreement required Hongson to absorb the loss on damaged merchandise. Mr. Wong added that he purchased in bulk on many occasions because he functioned as an agent for many purchasers, who bought the same merchandise as plaintiff.

### Discussion

■ It is well settled that *bona fide* buying commissions are not a proper element of dutiable value. *United States v. Nelson Bead Co.*, 42 CCPA 175, 183, C.A.D. 590 (1955); *J.C. Penney Purchasing Corp. v. United States*, 80 Cust.Ct. 84, 95, C.D. 4741, 451 F.Supp. 973, 982 (1978). Plaintiff has the burden of proving the existence of a *bona fide* agency relationship and that the charges paid were, in fact, *bona fide* buying commissions. *B & W Wholesale Co. v. United States*, 58 CCPA 92, 97, C.A.D. 1010, 436 F.2d 1399, 1403 (1971); *New Trends, Inc. v. United States*, 10 CIT ——, ——, 645 F.Supp. 957, 960 (1986); *J.C. Penney*, 80 Cust.Ct. at 94, 451 F.Supp. at 982. If plaintiff does not clearly establish that such a relationship existed, then the relationship is not that of agency. *Globemaster Midwest, Inc. v. United States*, 67 Cust.Ct. 539, 545, R.D. 11758, 337 F.Supp. 465, 470 (1971).

It is not disputed that Hongson did engage in activities indicative of an agency relationship. Mr. Wong accompanied Mr. Rosenthal to the Canton Fair. Tr. at 16. He helped plaintiff obtain samples, place orders, compare trading companies, translate, take measurements and acquire quotes on prices. These services are typical of those rendered by buying agents. 80 Cust.Ct. at 97, 451 F.Supp. at 984. However, "[o]ne may submit to a degree of control by another without being [his] agent...." 10 CIT at ——, 645 F.Supp. at 961 (quoting *Mathews Conveyor Co. v. Palmer–Bee Co.*, 135 F.2d 73, 81 (6th Cir. 1943)).

Mr. Rosenthal, by attending the Fair, meeting suppliers and participating in negotiations engaged in activities which undoubtedly support an agency relationship. *See J.C. Penney*, 80 Cust.Ct. at 96, 451 F.Supp. at 983–84. Likewise, being able to purchase directly without the assistance of Mr. Wong also evidences an agency relationship.[2] *Id.*

■ However, the Court must examine all relevant factors in deciding whether a *bona fide* agency relationship exists. *J.C. Penney*, 80 Cust.Ct. at 95, 451 F.Supp. at 983. These factors include: the right of the principal to control the agent's conduct; the transaction documents; whether the importer could have purchased directly from the manufacturers without employing an agent; whether the intermediary was operating an independent business, primarily for its own benefit; and, the existence of a buying agency agreement. Although no single factor is determinative, the primary consideration is the "right of the principal to control the agent's conduct with respect to the matters entrusted to him." *Id.; accord B & W Wholesale*, 58 CCPA at 95, 436 F.2d at 1402; *Globemaster*, 67 Cust.Ct. at 546, 337 F.Supp. at 470.

■ There are several aspects of Mr. Wong's conduct plaintiff failed to control. First, plaintiff did not control from which factory Hongson selected the subject merchandise. Hongson's quote sheet on its own invoice paper to plaintiff omits the name of any manufacturer. Therefore, plaintiff could not have known from which factory Hongson purchased the goods. A factor which negates the existence of an agency relationship is the lack of control over the choice of factories. *See B & W Wholesale*, 58 CCPA at 95, 436 F.2d at 1402; *J.C. Penney*, 80 Cust.Ct. at 95–96, 451 F.Supp. at 983–84. Failure to substantiate the names of manufacturers is evidence that no agency relationship existed.

---

**2.** This point is in dispute. Mr. Garretto testified that it was not credible that an American purchaser could buy directly from the PRC during the time in question. Plaintiff offered nothing to prove that he did buy directly. In any event, the Court's determination would not be altered by resolution in favor of plaintiff on this point.

*New Trends*, 10 CIT at ——, 645 F.Supp. at 960.

Second, Hongson purchased quantities up to ten times greater than the amount ordered by plaintiff.[3] The larger shipments make it apparent that the manufacturers could not have known that one-tenth of the order was purchased on behalf of Rosenthal–Netter, a factor which militates against an agency relationship. *See J.C. Penney*, 80 Cust.Ct. at 96, 451 F.Supp. at 983.

Third, plaintiff did not control the amount of discretion exercised by Hongson in the purchasing process. In *New Trends*, the court held that no agency relationship existed because the alleged agent retained a great deal of discretion and authority in the purchasing process. 10 CIT at ——, 645 F.Supp. at 960. Specifically, no instructions were given with respect to how the goods were to be handled or shipped. *Id.* Similarly, Hongson retained all discretion to negotiate price and to negotiate the means of transport with the freight companies. Additionally, Hongson bought in bulk, making it unlikely that plaintiff exerted control over the purchasing process. *Cf. J.C. Penney*, 80 Cust.Ct. at 95, 451 F.Supp. at 983 (the agent "was given *no* discretion in the purchase of the subject merchandise") (emphasis added).

Fourth, plaintiff allowed Hongson to absorb the cost of shipping and handling. A critical factor in *New Trends*, which detracted from the agency relationship was that the alleged agent absorbed the cost of shipping and handling as part of its commission. *New Trends*, 10 CIT at ——, 645 F.Supp. at 960. In the instant action, plaintiff claimed the "10% Handling Charge" compensated Hongson for these charges. But upon closer examination, the nature of the handling charge is extremely suspect. The government introduced into evidence three of Hongson's invoices, all of which included a breakdown of the handling charges as follows:

(1) the cost of moving the goods to the warehouse from the piers;

(2) the packing charge;

(3) the cost of moving the goods back to the pier from the warehouse;

(4) goods from warehouse loading to container;

(5) fumigation.

These costs always equalled exactly 10% of the total invoice cost of the goods. *See* Defendant's Exhibit A–3. According to Mr. Rosenthal, the flat 10% charge was to offset any losses Hongson might suffer from damaged or defective merchandise, as well as the cost of shipping and handling. Tr. at 50. Mr. Wong, however, stated that 10% was not enough compensation to cover Hongson's losses. Tr. at 120. Therefore, when the damaged merchandise equalled or exceeded the "10% Handling Charge," the shipping and handling expenses necessarily were taken out of the "5% Commission."[4] The fact that the intermediary absorbs the cost of shipping and handling out of its commission is evidence that the agency relationship did not exist. *New Trends*, 10 CIT at ——, 645 F.Supp. at 960.

Fifth, plaintiff did not control the manner of payment. The letters of credit opened by plaintiff to pay for the subject merchandise were made payable to Hong-

---

3. Defendant's Exhibit A–3 reflected Hongson's purchase of 1,035 sets of an item, from which only 135 sets were sent to plaintiff. *See* Tr. at 107–08. Mr. Wong claimed the larger purchases were a result of his functioning as an agent for many buyers, who happened to have ordered the same item. Plaintiff, however, presented no evidence at trial, other than the testimony of Mr. Wong, to show that Hongson had, in fact, operated as an agent to others, or that the suppliers knew plaintiff was the actual purchaser.

4. The composition of the handling charge is further complicated by the fact that Hongson claimed to have received a discount (which it did not pass on to plaintiff) on the price of goods from the PRC suppliers. The PRC allegedly paid the discount as compensation for damaged merchandise. However, the documentary evidence and the testimony of Mr. Garretto indicate that the discounts were commissions, and not compensation. Mr. Garretto testified that "if the Chinese have a good customer ... who buys in large quantities, they give him a discount." Tr. at 153. In any event, what is clear is that plaintiff did not control the costs associated with the transaction.

son Arts Co. Hongson used the letters of credit as master receipts to open new letters of credit to pay the suppliers. From the master letters of credit, Hongson also deducted its commission, handling charges, freight charges, and the costs of opening all letters of credit. An importer's failure to control the manner of payment is a factor evidencing the nonexistence of an agency relationship. 10 CIT at —, 645 F.Supp. at 961.

However, control is but one aspect of an agency relationship. 10 CIT at —, 645 F.Supp. at 960. Other factors outlined in the *Restatement (Second) of Agency* § 14K (1958), illustrate when one is acting as an agent as opposed to a seller:

§ 14K. Agent or Supplier

One who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act *primarily for the benefit of the other* and not for himself (emphasis added).

The *Restatement* also lists the following factors to assist in determining when one is selling to, as opposed to acting as an agent for, the alleged principal:

(1) That he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property.

*Restatement (Second) of Agency* § 14K comment a (1958).

The transaction documents reveal that Hongson operated an independent business, primarily for its own benefit. The government introduced as evidence: a sales confirmation from the PRC to Hongson, *see* Defendant's Exhibit E; and a sales confirmation from Hongson Arts to Rosenthal–Netter, Inc., which lists Rosenthal–Netter as the "buyer" and states "confirmation of order given by the undermen-

tioned [plaintiff] and accepted by Hongson Arts Company." *See* Defendant's Exhibit B. These documents reflect two separate transactions: Hongson buying from the PRC and Rosenthal–Netter buying from Hongson. Plaintiff failed to refute defendant's evidence establishing a relationship between itself as the buyer and Hongson as the seller of merchandise.[5]

Additionally, a Special Customs Invoice listed Hongson as the "seller" of merchandise. *See* Defendant's Collective Exhibit A. Plaintiff attested to the accuracy of the Invoice when it submitted the papers to Customs. Invoices of this type have been found to be inconsistent with an agency relationship. *New Trends,* 10 CIT at —, 645 F.Supp. at 961.

Where the official papers accompanying an entry unequivocally set out a relationship between two parties which is subsequently disclaimed by them, this court has looked askance at such later allegations in the absence of clear and convincing proof that the statements made at time of entry were erroneous.

*Globemaster,* 67 Cust.Ct. at 545, 337 F.Supp. at 470 (quoting *United States v. Manhattan Novelty Corp.,* 63 Cust.Ct. 699, 704, A.R.D. 263 (1969)).

Another factor depicting a buyer-seller relationship is the language used in the correspondence between the alleged agent and the importer. 10 CIT at —, 645 F.Supp. at 961. Hongson sent letters to plaintiff containing the following language: "acknowledg[ing] the receipt of your [plaintiff] captioned purchase order," Defendant's Exhibit C, and "we have recently received a new offer of Fern Tray from our supplier.... We are looking forward to receiving your favourable order." Defendant's Exhibit D. Plaintiff contends the use of the term "our supplier" means Hongson's and plaintiff's collective supplier, not solely Hongson's. Plaintiff's testimony, however, is insufficient to rebut or refute the documents in evidence. *See* 10 CIT at

---

5. Mr. Wong testified that even though Hongson paid the suppliers directly, in its own name, the actual transaction was between the suppliers (as sellers) and plaintiff (as buyer). However, the Court, in evaluating Mr. Wong's testimony against the documents, finds that plaintiff did not substantiate its relationship with the suppliers.

——, 645 F.Supp. at 962. Plaintiff contends that the testimony need not be corroborated with documents and refers the Court to Judge Newman's decision in *Park Avenue Imports v. United States*, 62 Cust.Ct. 1035, A.R.D. 255, 299 F.Supp. 528 (1969), where the court stated that despite the importer's lack of evidence of any "correspondence, orders, confirmation of orders, letters of credit, or checks, ... [importer's] other oral and documentary evidence sufficed in our opinion to overcome the presumption of correctness...." *Id.* at 1043, 299 F.Supp. at 534. But in *Park Avenue Imports*, the "essential facts ... were not effectively controverted by any evidence adduced by [the government]." *Id.* at 1042, 299 F.Supp. at 534.

The pricing structure employed by Hongson also demonstrates that Hongson traded on its own account, for its own benefit. Mr. Garretto, who reviewed plaintiff's protest, testified that the Customs Service rejected plaintiff's claim primarily because "Hongson Arts was selling to Rosenthal–Netter at a higher price than he was buying from China." Tr. at 148. In one instance, a PRC manufacturer charged Hongson 88¢ for an item, but plaintiff paid Hongson $1.01 for the same merchandise. *See* Defendant's Exhibit A–2, A–3. Thus, the pricing structure reflects Hongson's lack of financial detachment from the suppliers, indicating Hongson traded on its own account primarily for its own benefit. *Cf. J.C. Penney*, 80 Cust.Ct. at 92, 451 F.Supp. at 981 (the manufacturers' invoice price was the same price [the agent] invoiced Penney for the merchandise).

It is uncharacteristic of an agency relationship to allow the intermediary to bear the risk for damaged, lost, or defective merchandise. *New Trends*, 10 CIT at ——, 645 F.Supp. at 962. Losses which were greater than the "10% Handling Charge"

were left to Hongson's "own devices as far as recoupment from the supplier of the defective merchandise is concerned." *Plaintiff's Post–Trial Brief* at 21. Plaintiff asserts that Hongson was in the same position as was the agent in *J.C. Penney* with regard to losses on damaged goods. However, the court in *J.C. Penney* unequivocally stated that the agent "at no time had an insurable interest or bore the risk of loss...." 80 Cust.Ct. at 100, 451 F.Supp. at 986.

Futhermore, plaintiff could cancel orders outright, leaving Hongson with inventories and the total risk of loss on the goods. When plaintiff cancelled orders, the PRC rarely took back the merchandise. Hongson would be forced to sell the cancelled goods to other buyers, thereby trading on its own account; an act of an independent seller of merchandise. A characteristic of a seller is "[t]hat he acts in his own name and receives the title to the property which he thereafter is to transfer." *Restatement (Second) of Agency* § 14K comment a(2) (1958). Hongson is never able to transfer title to the cancelled goods to plaintiff. Instead, Hongson must transfer the goods to someone else. The assumption of title by the alleged agent is a factor bearing on the agency-principal relationship.[6] 80 Cust.Ct. at 100, 451 F.Supp. at 986.

Plaintiff next suggests that the written agency agreement entered into by Hongson and Rosenthal–Netter, spelling out the duties to be performed by Hongson, evidences a *bona fide* agency relationship. While it is true that a buying agency agreement supports the notion of a *bona fide* agency relationship, *J.C. Penney*, 80 Cust.Ct. at 98, 451 F.Supp. at 985, it is not dispositive on the issue. 10 CIT at ——, 645 F.Supp. at 962. An agency agreement is only evidence that the parties intended to

---

**6.** Title passed to the agent in *J.C. Penney* but did not negate the existence of the agency because Penney eventually assumed title to the goods. The *Penney* court looked to *Mitsui & Co. (U.S. A.), Inc. v. United States*, 66 Cust.Ct. 553, 556, R.D. 11740 (1971), where an alleged agent taking title did not preclude the finding of a *bona fide* agency relationship. In that case as well, title eventually passed to the importer. Here, title to cancelled goods never passes to Rosenthal–Netter but to other buyers. Hence, Hongson acts as a seller of the merchandise on its own account in these instances. If, on the other hand, plaintiff was responsible for the goods and always assumed title or risk, the temporary assumption of title by Hongson would not necessarily be debilitating to plaintiff's claim.

create an agency relationship. However, whether the parties succeed in creating such a relationship must be established by sufficient evidence. "Acts may support, or they may cast doubt upon, the words which parties speak or reduce to writing." *Hub Floral Mfg. v. United States*, 60 Cust.Ct. 905, 906, R.D. 11544 (1968). In this situation, the actions of the parties do not substantiate the claim that a *bona fide* agency was in fact created.

### Conclusion

On balance, taking into consideration the amount of control exerted over Hongson, the pricing structure, the risk of loss allocation, the transaction documents, the discretion allowed Hongson and the credible testimony, the Court holds that plaintiff failed to meet its burden of proof and overcome the presumption of correctness afforded the government. Therefore, the action is dismissed and the appraisement by the Customs Service is sustained.