**PIER 1 IMPORTS, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 86–01–00097.**

United States Court of
International Trade.

Feb. 23, 1989.

Sheldon & Mak and Steven B. Lehat, Pasadena, Cal., for plaintiff.

John R. Bolton, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Saul Davis and Paula N. Rubin, New York City, for defendant.

## OPINION

TSOUCALAS, Judge:

Plaintiff challenges the United States Customs Service's (Customs) appraisement of several entries of merchandise from the People's Republic of China (PRC), the Philippines and Hong Kong. Pier 1 Imports, Inc., plaintiff, the importer of record and ultimate consignee of the involved merchandise, claims that the charges for "buying commissions" and "handling statement charges" in the appraised value are *bona fide* buying commissions properly excludable from the dutiable value of the subject merchandise. Customs maintains that Osco Limited (Osco), the entity paid the

commissions and charges, was not a *bona fide* buying agent but the seller and/or selling agent of the merchandise. It is agreed that the proper basis of appraisal is transaction value under § 402(b) of the Tariff Act of 1930, *as amended,* 19 U.S.C. § 1401a(b) (1982). Thus, the sole issue presented is whether a *bona fide* agency relationship existed between plaintiff and Osco.

### Trial

At the trial of this action, three witnesses testified on behalf of plaintiff: David Walker, the Manager of Replenishment (inventory control) for Pier 1 Imports; Raul A. Quadros, Pier 1's Director of International Transportation; and Marvin J. Girouard, Pier 1's Senior Vice President of Merchandising. Defendant produced Janis Seal, Supervisor, Customs, Los Angeles District.

Mr. Walker testified that his principal responsibilities at Pier 1 entailed managing the store replenishment system and reorders for basic stock merchandise. His testimony primarily focused on the flow of payments involving Osco and merchandise originating from the PRC, the Philippines and Hong Kong. He further stated that he handled the pertinent documentation relating to these transactions, *i.e.,* shipping and letter of credit documents.

Mr. Walker advanced that plaintiff's representatives traveled to the PRC, ordered goods, and instructed sellers to ship the merchandise to Osco in Hong Kong. Plaintiff paid for the goods, he added, by opening letters of credit in favor of Osco, either at sight or deferred at plaintiff's option, which Osco used to open its own letters of credit to pay the manufacturers. He further testified that plaintiff would reimburse Osco for banking charges, out-of-pocket expenses, and repacking charges in connection with these transactions.

On the shipments prepaid by Osco, Mr. Walker submitted that Osco charged plaintiff interest, and that the deferred payment option also applied to freight prepayments. He stated that plaintiff chose delayed payment financing on six of twenty shipments

from the PRC, the one shipment from Hong Kong, and none of the Philippines transactions. Trial Transcript at 11 [hereinafter Tr. at __]. He further testified that Osco's commissions were based on 6% of invoice price for f.o.b. contracts and 4% of invoice price for c.i.f. contracts, and plaintiff decided whether the shipment was to be f.o.b. or c.i.f.

Concerning plaintiff's purchases from the Philippines and Hong Kong, Mr. Walker stated that Osco received only service commissions, and no handling or out-of-pocket charges.

Raul A. Quadros testified that he was responsible for the shipments routed through Hong Kong to the United States. He declared that he negotiated the freight rates with the shipping lines on behalf of Pier 1 for the present 22 shipments. He also claimed that Osco followed plaintiff's instructions with respect to the shipment of the goods through shipping and routing guidelines attached to each purchase order and accompanying letter of credit.

Mr. Quadros further testified that plaintiff could have bought directly from the PRC suppliers, but chose instead to use Osco as a buying agent.

Marvin J. Girouard testified that he was in charge of setting the budgets and buying for plaintiff. He testified that he traveled to the PRC accompanied by Osco, and purchased the merchandise directly at the Canton Fair by meeting with representatives of the respective provinces and discussing price, delivery dates, packaging, quality and quantity. On reorders, he stated that plaintiff would telex Osco, and ask them to contact the PRC provinces which sold the particular product of interest and obtain quotations on price, delivery, and packing; plaintiff would then telex Osco to confirm the particulars.

On the Philippines and Hong Kong transactions, Mr. Girouard stated that plaintiff's buyers dealt directly with the manufacturers or manufacturers' representatives, in the presence of Osco. He also stated that reorders were made directly to the suppliers, with a copy sent to Osco.

Mr. Girouard additionally set forth plaintiff's justification for the structural difference between the PRC purchases and purchases from the Philippines and Hong Kong: when plaintiff bought goods from the PRC, they were purchased from several different provinces; therefore, it was in plaintiff's economic self-interest to consolidate the goods in Hong Kong before shipment to the United States.

Defendant's sole witness was Janis Seal, the import specialist for the involved entries, who testified that her duties included appraising, classifying, and enforcing the applicable rules and regulations with respect to imported merchandise as well as conducting importer interviews. She testified that the criteria upon which she determines if one is a buying agent are as follows:

> if there was a bond filed, [a] buying agency agreement filed with U.S. Customs, if it was carried through, whether the agent was acting as an independent seller or whether he was working solely for the benefit of the importer and during this course, did he make any profits, get rebates, discounts which did he [sic] not pass onto the importer ... whether he purchased more merchandise than was ordered [by the importer]; by warehousing it, the excess quantity, whether the importer could refuse shipments thereby stockpiling this merchandise in the agent's warehouse ... the amount of control and discretion the agent had in the form of purchasing and payment of the merchandise.

Tr. at 288–99.

As to the importations involved here, Ms. Seal testified that Pier 1 had been importing from Osco, goods manufactured in the PRC, shipped through Hong Kong and then ultimately to the United States. She observed that when plaintiff submitted Osco's invoices to Customs in f.o.b. terms, Osco's commission was itemized in the cost breakdown. But when subsequent invoices did not contain a breakdown of f.o.b. charges, she claims to have questioned plaintiff as to whether commissions were still included in the invoice price, and to

have received no response when she requested invoices that itemized the f.o.b. charges. She also explained that Osco was listed as the seller on the Special Customs Invoices, that all documentation filed pointed to Osco being the selling agent, and that it was not sufficient, by itself, that an importer traveled to the PRC to order merchandise with its representative. Moreover, she stated that the invoices from the PRC listed Osco as the only entity, with no mention of Pier 1, and it appeared to her from the documents that Osco was buying for its own account and reselling the merchandise as an independent seller.

## Discussion

 *Bona fide* buying commissions paid to an agent are not a proper element of dutiable value. *Rosenthal–Netter, Inc. v. United States*, 12 CIT ——, ——, 679 F.Supp. 21, 23 (1988), *aff'd*, 861 F.2d 261 (Fed.Cir.1988). Plaintiff has the burden of proving that a *bona fide* agency relationship exists and if plaintiff does not clearly establish that relationship, then it is not one of agency. *Id.* In deciding whether a *bona fide* agency relationship exists, the Court must examine all the relevant factors, *id.*, and "each case is governed by its own particular facts." *J.C. Penney Purchasing Corp. v. United States*, 80 Cust.Ct. 84, 95, C.D. 4741, 451 F.Supp. 973, 983 (1978); *United States v. Nelson Bead Co.*, 42 CCPA 175, 183, C.A.D. 590 (1955). No single factor is determinative; however, the primary consideration is the "right of the principal to control the agent's conduct with respect to the matters entrusted to him." 80 Cust.Ct. at 95, 451 F.Supp. at 983; *Rosenthal–Netter*, 12 CIT at ——, 679 F.Supp. at 23.

An examination of the record reveals that plaintiff controlled the purchasing process. It was plaintiff's responsibility to select the merchandise, determine quantity,

negotiate the f.o.b. purchase price, and negotiate delivery from the PRC suppliers. *See* Plaintiff's Exhibit 24 at ¶ 2.[1] Osco, consequently, retained minimal discretion in purchasing the subject merchandise, understanding its role to be one where

> the selection, quantity and negotiation of FOB price and delivery[ of merchandise from suppliers within the agreed geographical territories *is entirely in the hands and control of the Pier 1 buyers.*

Plaintiff's Exhibit 25 (telex of May 20, 1980 at ¶ 3) (emphasis added). Control over the purchasing process is strong evidence that an agency relationship exists. *See Rosenthal–Netter* 12 CIT at ——, 679 F.Supp. at 24; *J.C. Penney*, 80 Cust.Ct. at 95–96, 451 F.Supp. at 983.

Additionally, in performing these functions, plaintiff's buyers and representatives traveled to the PRC conjointly with Osco, where they negotiated with the factories and set up purchase terms for the merchandise. *See* Tr. at 29, 288–90; Plaintiff's Collective Exhibit 2. This court accords significance to an importer who actually visits and participates in negotiations with the factories. *J.C. Penney*, 80 Cust.Ct. at 96, 451 F.Supp. at 984.

The manner of payment also illustrates a facet of plaintiff's control. Plaintiff would issue a master letter of credit for each purchase order, payable to Osco either at sight or deferred at plaintiff's option and Osco would then set up a back-to-back letter of credit between itself and the PRC manufacturer invoiced in the *exact* amount of plaintiff's purchase order and letter of credit. This arrangement demonstrates that Osco purchased the subject merchandise only at the direction of plaintiff, conforming with plaintiff's orders. When an intermediary "can only place an order with a factory after ... receiv[ing] such instructions from an importer [it] is further evi-

---

1. The paragraph reads as follows:
 SELECTION, PURCHASE AND SALE OF MERCHANDISE. The selection, quantity and negotiation of the FOB purchase price and delivery of merchandise from suppliers in the Peoples Republic of China and the other countries specified herein, to be purchased by OSCO and/or its nominees, shall be the exclusive prerogative and responsibility of the representatives of PIER 1. It is understood that the merchandise purchased by OSCO pursuant to this Agreement shall be repurchased from OSCO by PIER 1.

dence of the existence of a buying agency." *Id.*

It is important to note the distinction between the manner of payment employed by the importer in *Rosenthal–Netter*, where the intermediary retained the discretion to deduct its commission, handling charges, freight charges, and banking costs from master letters of credit, as opposed to the manner of payment employed in the instant situation. *See* 12 CIT at ——, 679 F.Supp. at 24–25. Here, plaintiff invoiced charges separately and paid for them separately, thereby exercising greater control over Osco.

Plaintiff also had the option of purchasing directly from the manufacturers.[2] "The fact that an importer has an opportunity to purchase merchandise directly, without being required to seek the assistance of an intervening party, has been held to support the existence of an agency relationship." *J.C. Penney*, 80 Cust.Ct. at 96, 451 F.Supp. at 984.

The shipping and handling of merchandise was also controlled by plaintiff. Defendant denies plaintiff controlled shipping, and refers to the passage in the Agreement which states that "[t]he selection of shipping lines shall be the exclusive prerogative of OSCO." Plaintiff's Exhibit 24 at ¶ 3.[3] However, the evidence adduced at trial indicates otherwise. *See* Plaintiff's Exhibits 14–17, 23; Tr. at 152–75. Plaintiff directed Osco, by the use of routing guidelines attached to purchase orders and letters of credit, to use its preferred carrier choice or other viable alternatives pending unavailability of the preferred choice. *See, e.g.*, Plaintiff's Exhibit 1; Tr. at 22–24, 152. The correspondence between Osco and plaintiff also reveals that Osco responded primarily to plaintiff's instruction with re-

spect to shipping: in one telex plaintiff instructed Osco to "[p]lease make sure suppliers produce merchandise accordingly for utilization, per usual strict quality control inspection measures before loading." Plaintiff's Exhibit 15 (telex of Aug. 19, 1981). Osco replied that it "will act accordingly." *Id.* In another telex, Osco responded that it was "awaiting plaintiff's new instructions" regarding which shipping line to use. Plaintiff's Exhibit 14 (telex received May 27, 1981).

Plaintiff has put forth clear and convincing proof that Osco operated within the ambit of its control. However, "control is but one aspect of an agency relationship." *Rosenthal–Netter*, 12 CIT at ——, 679 F.Supp. at 25. The *Restatement (Second) of Agency* § 14K (1958) terms an agent as one who "is to act primarily for the benefit of the other and not for himself." The relationship in the instant action comports with the principle enunciated in the Restatement, as exemplified in a telex where Osco explicitly stated that

> [it] is not a competitor but an adjunct and a partner of Pier 1 *whose primary role is to service and protect [Pier 1's] interest* by sourcing and assisting Pier 1 buyers in obtaining and shipping quality merchandise at the lowest price....

Plaintiff's Exhibit 25 (telex of May 20, 1980 at ¶ 3) (emphasis added).

The record demonstrates that Osco did not buy on its own account, but bought on behalf of plaintiff after receiving purchase orders. Plaintiff neither negotiated nor bought from Osco. Osco operated as an intermediary through which plaintiff made purchases "from any vendors in the agreed countries." *Id.* at ¶ 1. Osco had no financial interest in any of the manufacturers,[4]

---

2. Mr. Quadros explained that in 1977, one or two shipments involving Osco were made directly from the PRC to plaintiff via a feeder ship from China to Japan and then a mother ship from Japan to the United States. He said this practice was discontinued because it had been found to be inconvenient, expensive and that he could not receive satisfactory information pertaining to the shipments. Tr. at 154–55.

3. Additionally, defendant refers to certain correspondence between plaintiff and Osco as evi-

dence of Osco not complying with plaintiff's choice of carrier. *See* Plaintiff's Exhibit 23. The correspondence, however, indicates that plaintiff actively monitored Osco and sought to minimize its costs and losses by seeking Osco's compliance with its carrier choices.

4. Osco received rebates from the manufacturers in the PRC. Defendant's Exhibit E at 2; Tr. at 128–30. However, rebates which are routinely granted to intermediaries do not defeat an agency relationship, especially when the rebates

and the commissions Osco received did not inure to the benefit of the manufacturers: factors which, if present, would have contradicted the agency relationship. *See J.C. Penney,* 80 Cust.Ct. at 97, 451 F.Supp. at 984.

Defendant refers to The Customs Report of Investigation containing Mr. Girouard's statement, which ostensibly exposed Osco as trading on its own account. Specifically, Mr. Girouard stated the following: that Osco had purchased goods outright and resold them to Pier 1; that there were additional profits to Osco through cash rebates not reflected on the invoices; that the price Osco sold to Pier 1 was original "cost" plus a service fee; and that the reduction in price to Osco effected a cash surplus between the original cost to Pier 1 and the amount Osco actually paid. These events transpired presumably when Osco made bulk purchases. For support of this position, defendant also refers to language in the Agreement which states that "merchandise purchased by OSCO pursuant to this Agreement shall be repurchased from OSCO by PIER 1." Plaintiff's Exhibit 24 at ¶ 2. However, the "purchases" and "repurchases" are not indicative of independent selling by Osco; but reflect the structure plaintiff established to purchase from the PRC. While it is true that Osco "purchased" merchandise from the PRC, it was not until plaintiff ordered the merchandise, and forwarded the funds necessary for acquisition that Osco actually purchased the goods. Consequently, Osco operated only at the bequest of plaintiff, not autonomously. *See* 80 Cust.Ct. at 100 n. 11, 451 F.Supp. at 986–87 n. 11.

Furthermore, it does not detract from an agency, as defendant asserts, that plaintiff neither checked the amount paid to the PRC nor possessed any documentation of what Osco paid. *See id.* at 102, 451 F.Supp. at 987.

Defendant additionally claims that the official papers of the involved entries establish a buyer-seller relationship. All the entry papers in the present action including the Special Customs Invoices referred to Osco as the seller of the merchandise, and to Pier 1 as the buyer. None of the entry papers listed the PRC manufacturers as sellers. Plaintiff had the opportunity to inspect these documents, but made no corrections, and attested to their accuracy when submitted to Customs.

Where the official papers accompanying an entry unequivocally set out a relationship between two parties which is subsequently disclaimed by them, this court has looked askance at such later allegations *in the absence of clear and convincing proof that the statements made at the time of entry were erroneous.* *Globemaster Midwest, Inc. v. United States,* 67 Cust.Ct. 539, 545, R.D. 11758, 337 F.Supp. 465, 470 (1971) (quoting *United States v. Manhattan Novelty Corp.,* 63 Cust.Ct. 699, 704, A.R.D. 263 (1969)) (emphasis added); *see also Rosenthal–Netter,* 12 CIT at ——, 679 F.Supp. at 25; *New Trends Inc. v. United States,* 10 CIT 637, 642–43, 645 F.Supp. 957, 961 (1986).

However, whether the relationship is one of buyer-seller or agent-principal "is to be determined by the substance of the transaction—not by the labels the parties attach to it." *Dorf Int'l, Inc. v. United States,* 61 Cust.Ct. 604, 610, A.R.D. 245, 291 F.Supp. 690, 694 (1968) (citing Mechem *On Agency* (2d ed.) § 47). In *Dorf,* the court found that "the agreement in question, while cast in terms of a buyer and seller relation, was in reality a principal-agent relationship between the contracting parties," *id.,* despite the agent being "clothed in the garb of an 'independent contractor'" in the agreement. *Id.* at 611, 291 F.Supp. at 695. The Court here, likewise, finds that the substance of this transaction supports the conclusion that Osco operated as plaintiff's buying agent regardless of the terminology employed.

were not part of the transaction between plaintiff and sellers and do "not controvert the fact that the ... commission ... was a buying commission not part of dutiable value." *United States v. Knit Wits (Wiley),* 62 Cust.Ct. 1008, 1014, A.R.D. 251, 296 F.Supp. 949, 954 (1969) (citing *Lollytogs, Ltd. v. United States,* 55 Cust.Ct. 608, Reap.Dec. 11073 (1965)); *see also United States v. Alfred Kohlberg, Inc.,* 27 CCPA 223, C.A.D. 88 (1940).

Moreover, the risk of loss of the goods was not on Osco. "It is uncharacteristic of an agency relationship to allow the intermediary to bear the risk for damaged, lost, or defective merchandise." *Rosenthal-Netter,* 12 CIT at ——, 679 F.Supp. at 26. In this instance, Osco was liable only for its own negligence. Paragraph 7 of the Osco-Pier 1 agreement states that

> OSCO shall not be liable for any short or erroneous shipments or for defective or damaged goods from the Peoples Republic of China or other countries in situations where the goods have already been packed for shipment by the supplier without representatives of OSCO being present during such packing.
>
> OSCO is also not responsible for damage to shipments in transit or to delays incurred by the shipping lines.

Plaintiff's Exhibit 24 at ¶ 7. The testimony at trial, which the Court accepts, and the evidence in the record makes clear that Osco did not bear the risk of loss for the merchandise, only for its own negligence, which does not bear on the agency relationship. *See* Tr. at 203–05.

The terminology in the correspondence between plaintiff and Osco in doing business is confusing,[5] but lends itself to an interpretation which indicates plaintiff's hands-on control over Osco's behavior. Plaintiff monitored and took an active part in procuring the merchandise from the PRC, often giving Osco direction on the proper course of action. *See, e.g.,* Plaintiff's Exhibits 4–6, 23–26.

In regard to the Philippines and Hong Kong transactions, the Court concludes that Osco functioned in the capacity of a buying agent as well. Despite not receiving handling or out-of-pocket charges, it is clear that Osco, pursuant to the Agreement, assisted plaintiff and operated at plaintiff's instruction.

### Conclusion

Although the record is not clear on all points and is sometimes contradictory, viewed as a whole the Court finds that there is sufficient evidence to support its finding that Osco operated as plaintiff's *bona fide* buying agent in Hong Kong. Therefore, the commissions and handling statement charges paid to Osco are not properly part of the dutiable value of the subject merchandise under transaction value, 19 U.S.C. § 1401a(b).

### JUDGMENT

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED: that the entries involved herein are properly appraised pursuant to transaction value, 19 U.S.C. § 1401a(b), and the charges denominated "buying commissions" and "handling statement charges" are *bona fide* buying commissions not part of the dutiable value; and it is further

ORDERED, ADJUDGED, and DECREED: that defendant shall return all and any excess duties paid by plaintiff, together with interest.

---

**5.** Sales confirmations between the PRC and Osco listed Osco as the purchaser and did not mention Pier 1 at all. A factor which indicates an agency relationship is when the factories are aware that plaintiff and not the alleged agent is the purchaser. *J.C. Penney,* 80 Cust.Ct. at 96, 451 F.Supp. at 983. Additionally, all of the purchase orders listed Osco as the seller and all of the invoices stated that the merchandise was "sold to" Pier 1. *See* Plaintiff's Exhibits 1–2.