**NISSHO IWAI AMERICAN
CORPORATION,
Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 86–11–01439.**

United States Court of
International Trade.

Feb. 28, 1992.

Sharretts, Paley, Carter & Blauvelt, P.C., Ned H. Marshak and Peter Jay Baskin, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Atty. in Charge, Commer-

cial Litigation Branch, Civ. Div., U.S. Dept. of Justice, and John J. Mahon, Washington, D.C., for defendant.

## AMENDED OPINION AND ORDER

MUSGRAVE, Judge.

### I. INTRODUCTION

Plaintiff Nissho Iwai American Corporation ("Nissho American" or "NIAC") moves for summary judgment for reliquidation of certain entries of 205 R–62 subway cars imported from Japan for use in the New York City subway system. The government cross-moves for summary judgment. This opinion amends and replaces Slip Opinion 91–114, issued December 20, 1991.

■ The parties agree that the R–62 subway cars should be appraised according to their transaction value, as defined in 19 U.S.C. § 1401a(b)(1).[1] The dispute arises over whether to value the cars according to the contract price between the New York City Metropolitan Transportation Authority ("MTA"), the U.S. purchaser, and NIAC, or the price paid by plaintiff's corporate parent, Nissho Iwai Corporation ("Nissho Japan" or "NIC") to the primary manufacturer of the cars, Kawasaki Heavy Industries ("Kawasaki" or "KHI"). Alternatively, the government counterclaims for allegedly improperly deducted elements of value, in-

cluding commissions paid to NIAC, financing costs and insurance costs.

Plaintiff has not overcome the presumption of correctness attaching to Custom's valuation. 28 U.S.C. § 2639(a)(1) (1991). Because the contract which most directly caused the merchandise to be exported to the U.S. was the contract between the MTA and Nissho American, the Regional Commissioner of Customs correctly based transaction value on the contract price between MTA and NIAC. The government's cross-motion for summary judgment and counterclaim is granted as amended and plaintiff's claims for commissions, financing and insurance costs are denied.

### II. FACTUAL BACKGROUND

Plaintiff contracted with the MTA to deliver three hundred and twenty-five R–62 subway cars (the "Master Contract").[2] The MTA agreed to pay $844,500.00 per car ($889,391.00 per car after escalation charges and change orders), including freight, insurance, and customs duties.[3] Kawasaki and NIC worked together on the bid proposal, and KHI participated in the negotiations with MTA. The contract negotiations took place in the United States, and the contract was signed in New York City on March 17, 1982. Kawasaki signed a warranty of performance to MTA and NIAC on the same day.[4] The Master Con-

---

**1.** 19 U.S.C. § 1401a(b) provides in part:

(1) The transaction value of imported merchandise is the price actually paid or payable for the merchandise when sold for exportation to the United States, plus amounts equal to—
   (A) the packing costs incurred by the buyer with respect to the imported merchandise;
   (B) any selling commission incurred by the buyer with respect to the imported merchandise;
   (C) the value, apportioned as appropriate, of any assist;
   (D) any royalty or license fee related to the imported merchandise that the buyer is required to pay, directly or indirectly, as a condition of the sale of the imported merchandise for exportation to the United States; and
   (E) the proceeds of any subsequent resale, disposal, or use of the imported merchandise that accrue, directly or indirectly, to the seller.
19 U.S.C. § 1401a(b) (1991).

**2.** Equipment Contract R–31462 (R–62) (Revised) between Metropolitan Transportation Authority and Nissho Iwai American Corporation.

**3.** Master Contract, Articles VII, VII–A(a)(1), at 8.

**4.** Master Contract, Appendix H, provides:
   KAWASAKI HEAVY INDUSTRIES, LTD., a Japanese corporation ("KAWASAKI"), hereby represents and covenants:
   1. KAWASAKI has received a complete copy of the foregoing Contract, is fully and completely aware of all provisions of the Contract and consents to be named as car builder as provided in Article VI–C.
   2. KAWASAKI has the necessary facilities, skill and experience and ample financial resources to perform the obligations of car builder as a subcontractor to Contractor (or its assignee) under the Contract.
   3. KAWASAKI expressly stipulates that with respect to its performance *all work shall* ·

tract gave Nissho American the right to assign the contract to Nissho Japan[5], which NIAC did the same day as it signed the Master Contract. Nissho American is a wholly-owned subsidiary of Nissho Japan. Risks of changes in duty rates, taxes and currency fluctuations were borne by NIC.[6]

The Master Contract designated Kawasaki as the primary car builder[7] and specified that the cars would be manufactured using both U.S. and Japanese components.[8] Article XVII gave the MTA control over selection of subcontractors, while Article XVII(e) applied all the contract terms to any subcontractor. By the terms of the Master Contract, NIC was bound to select U.S. manufacturers for the propulsion and brake systems. These components were shipped by NIC to Kawasaki which incorporated them in the cars as they were built. NIAC was responsible for any damages or injury during transit and during repairs at the MTA.[9]

Nissho Japan and KHI agreed on March 23, 1983 that each car would cost NIAC approximately Y80 million upon delivery F.O.B. Kobe, Japan (the "Side Agreement"). Nissho Japan and KHI agreed to be jointly responsible for the quality of the cars. Kawasaki was responsible for obtaining MTA's approval of the cars on delivery, and providing technical assistance (testing, manuals, training) after delivery.[10] KHI also provided warranty service, including a service engineer, in New York until

August, 1990.[11] When the Side Agreement was signed, NIC owned .23 percent of KHI, and KHI owned .089 percent of NIC.[12] The Side Agreement was signed in Japan.

The cars were built and delivered as planned. The first one hundred and twenty cars were entered by NIAC at the KHI–NIC sales price.[13] Customs liquidated the last two hundred and five cars at the MTA–NIAC price, at a net dutiable value of $497,737.61 for cars entered in 1983 (8.9 percent duty rate), $500,495.16 for cars entered in 1984 (8.3 percent duty rate), and $503,751.17 for cars entered in 1985 (7.6 percent duty rate).[14] Nissho American protested those entries, which are now before the Court. When it entered the cars at issue here, NIAC also paid $884,655.99 in additional duties claimed for the cars liquidated at the KHI–NIC price. The government has abandoned its claim for the additional duties on the prior entries.

## III. DISCUSSION

On a motion for summary judgment, the Court must determine whether there are any material factual issues which remain to be decided. *Brosterhous, Coleman & Co. v. United States*, 14 CIT ——, ——, 737 F.Supp. 1197, 1199 (1990). If there are no material facts at issue when ruling on cross-motions for summary judgment, the Court must decide whether either party has demonstrated that it is entitled to judgment

---

    *strictly comply with all requirements of the Contract.*
    4. *KAWASAKI guarantees to Contractor and MTA* that the passenger cars shall be fit for their respective intended uses and free of all defects for the applicable periods set forth in Article XXXI of the Contract Terms and Conditions.
    Master Contract, Appendix H (emphasis added).

**5.** Master Contract, Art. VI–A.

**6.** Plaintiff's Brief in Support of Summary Judgment, fn. 3, at 11.

**7.** Master Contract, Art. VI–C provides:
    *Kawasaki as Car Builder.* The Contractor represents that the passenger cars to be furnished hereunder will be manufactured and produced by Kawasaki Heavy Industries, Ltd., Japan.

**8.** The Master Contract estimated that the content of the cars would be 57.45 percent Japanese, and 42.55 percent American-made components. Master Contract, Art. VII–A(c), at 10.

**9.** Master Contract, Art. XIV(a).

**10.** Defendant's Statement of Additional Material Facts Not In Issue, para. 8, at 4.

**11.** *Id.*, at 5.

**12.** KHI never owned more than one per cent of NIC, and vice versa. Plaintiff's Brief, at 10.

**13.** Plaintiff's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, para. 31, at 5–6.

**14.** *Id.*, para. 32, at 6.

as a matter of law. *Id.* There may be no genuine issues of material fact in dispute, as the Court cannot try issues of fact. *Carter Footwear v. United States,* 10 CIT 618, 1986 WL 10391 (1986); Wright, Law of Federal Courts § 99 at 664 (4th ed. 1983) (court may only determine whether there are issues to be tried). Summary judgment may be inappropriate where the parties agree on the basic facts, but disagree about the factual inferences to be drawn from those facts; if reasonable minds differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Warrior Tombigbee Transportation Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296–97 (11th Cir.1983); *Mitsui Foods, Inc. v. United States,* 12 CIT 276, 278, 688 F.Supp. 605, 606 (1988), *aff'd,* 7 Fed.Cir. (T) 36,867 F.2d 1401 (1989). The party against whom the motion is made is entitled to all the favorable inferences that may be reasonably drawn from the evidence, and if when so reasonably viewed reasonable minds might reach different conclusions, the motion should be denied. *Caylor v. Virden,* 217 F.2d 739 (8th Cir.1955).

On the facts before the Court, no material facts are at issue. The primary disagreement between the parties arises over whether the statutory transaction value should be based on the price paid by NIC to KHI or on the price set in the Master Contract between NIAC and MTA.

██ The Customs Service's valuation of the merchandise is entitled to a presumption of correctness,[15] and Customs' interpretation of its regulations will be accepted if it is "sufficiently reasonable." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). Customs rulings should be given the deference to which they are entitled. *Texas State Comm. for Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir.1986) (*citing United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)); *Julius Goldman's Egg City v. United States,* 697 F.2d 1051, 1055 (Fed.Cir.1983)

(deferential standard applies to review of agency's interpretation of its regulations).

### A. Brosterhous, Coleman & Co. v. United States

In *Brosterhous, Coleman & Co. v. United States,* an American manufacturer contracted with a West German firm to construct a chlorine dioxide bleach plant in the United States. The contract did not specify which subcontractors should be used and the foreign seller decided to use foreign components. *Brosterhous* held that "[w]hen there is more than one sale for exportation, Customs policy is that transaction value should be calculated according to the sale which most directly caused the merchandise to be exported to the United States." *Brosterhous,* 737 F.Supp. at 1199. The transaction value was the price the foreign seller paid for the components, rather than the contract amount, because the foreign seller was free to buy from any supplier, and *could* have fulfilled the contract by using only U.S. suppliers. *Id.* Because the foreign seller was not obligated to buy from abroad, the contract with the U.S. customer did not primarily cause the goods to be exported to the United States.

The operative facts in this case are directly contrary to *Brosterhous.* The MTA negotiated with NIAC on the express understanding that Kawasaki would build the cars. The Master Contract specified Kawasaki as the "primary builder." NIC/NIAC was *not* free to pick its supplier. It was obligated to buy from abroad. Following the *Brosterhous* analysis, the Master Contract was the contract which most directly caused the goods to be exported to the United States.

### B. E.C. McAfee v. United States

Plaintiff argues that *E.C. McAfee v. United States,* 6 Fed.Cir. (T) 92, 842 F.2d 314 (1988), should compel this Court to value the R–62 cars at the KHI–NIC price. In *McAfee,* U.S. customers ordered suits from Hong Kong distributors in the U.S., who then contracted with Hong Kong tai-

---

**15.** 28 U.S.C. § 2639(a)(1).

lors to assemble the suits from fabric supplied by the distributor and trim supplied by the tailors. A freight forwarder entered the suits through Customs and shipped them to customers. *McAfee* held that the suits were dutiable at the price paid by the Hong Kong distributor to the Hong Kong tailors rather than the price paid by the U.S. customer.

*McAfee* followed two key holdings in *United States v. Getz Bros. & Co.*, 55 CCPA 11, C.A.D. 927 (1967), where the issue was whether imported plywood should be valued at the manufacturer's price to a foreign middleman, or at the price between the foreign middleman and the U.S. customer. *Getz* held that foreign sales could provide a basis for valuation, and that if the transaction between the manufacturer and the foreign middleman fell within the statutory provision for valuation, the manufacturer's price, rather than the price from the middleman to his customer, should be used for appraisal. *McAfee*, 6 Fed.Cir. (T) at 97, 842 F.2d at 318, *citing Getz*, 55 CCPA at 18.

However, the *Getz* case did not involve an agreement where essentially all three parties, customer, middleman and manufacturer, agreed to a price for the goods. *Getz* involved two distinct transactions, with little or no contact between the actual supplier and the final customer. *McAfee* also involved a three-tier distribution process, with only the middleman having contact with both the tailors and the customers. There were several different levels of agreement, between the U.S. customer and the foreign middleman, between the foreign middleman and the U.S. importer, and between the middleman and the tailors.

### C. The Master Contract Was In Effect An Agreement Between MTA, NIC And KHI

In the case at bar, there is no need to pick between several different layers of contracts to determine the export-causing agreement. The Master Contract controlled the entire transaction. It was the transaction which most directly caused the export to the United States. Without it, no export would have taken place. All three parties to the transaction agreed to follow its terms. The Side Agreement depended on the Master Contract not only for subject matter, but also for many of its terms. Without the Master Contract, the Side Agreement would be a nullity.

■ The determination of which sale is for exportation should be made on a case-by-case basis. *McAfee*, 6 Fed.Cir. (T) at 98, 842 F.2d at 319. A clear understanding of the Master Contract shows that the facts are decidedly different from *McAfee*, although a more doctrinaire reading of the contract in the context of the *McAfee* case might come to a different conclusion. The true nature of the transaction is revealed by the extensive involvement of KHI from the very beginning, and requires the valuation of the R–62 cars at the Master Contract price.

The Master Contract was above all a manufacturing contract. Kawasaki and NIC worked together on the bid proposal. MTA negotiated with both KHI and Nissho American after the NIAC/KHI bid was selected. All three knew what responsibilities each would have under the contract from the very beginning. The Master Contract designated Kawasaki as the manufacturer, established the specifications which controlled Kawasaki's manufacturing, vested approval of all KHI's subcontractor's in the MTA, and provides for control of value content in the MTA.[16] As described by the government,

> the facts in this case demonstrate that the MTA purchased the R–62 vehicles in issue from NIAC/NIC with the understanding and requirement that they would be comprised of 57.45% [Japanese] components and 42.55% of [U.S.] components, and that KHI would assume the responsibilities ... regarding technical matters and specifications both before and after the delivery of the vehicles to the United States. They also demonstrate that NIC and KHI negotiated prices with a view toward what the final

---

**16.** *See,* respectively, Master Contract Art. VI–C, Appendix E, Art. XVII, and Art. VIII–A.

MTA purchase price would be and entered into agreements as to their joint responsibilities regarding the performance of the MTA master contract and the securing of the U.S. components of the vehicles. They also demonstrate that KHI's role was not merely that of an assembler who assembled components in which it had no interest. Rather, it fabricated the R–62 vehicles from Japanese components which it owned and the U.S. components which NIC owned and was paid by NIC for its work in fabricating the vehicles and for the technical responsibilities it had agreed to provide both before and after delivery of the vehicles [to] the United States.[17]

Although Kawasaki was not a signatory to the Master Contract, the arrangements made show that it was excluded in only the formal sense of the contract. Kawasaki was preselected by the MTA as manufacturer before the Master Contract was signed. Its name appears several times in the contract, and it had rights and duties according it a major role in the contract. There were face-to-face meetings between KHI and the MTA. Kawasaki signed a warranty of performance to both the MTA and NIAC, and agreed to abide by the terms of the Contract. It was, at the very least, a third-party beneficiary named explicitly in the Master Contract.[18]

Nissho Japan supplied KHI with American-made components which made up over 42 percent of the value of the cars. While this does not *require* a different result from *McAfee*, it shows the fundamental differences between the two cases. In *McAfee*, the American customer agreed to

buy a 100 percent imported suit. In this case, the MTA agreed to the Master Contract to buy cars that were 57 percent Japanese and 42 percent American. The commingling of American-made parts into foreign-made cars muddies the clear waters of the *McAfee* holding. The Court of Appeals for the Federal Circuit valued the *McAfee* transaction between the assembler and the middleman. It had a choice between two discrete transactions. Here the Court is presented with a manufacturer which has dealt extensively with the U.S. customer, and a secondary contract which seems more like an afterthought than a true arms-length transaction. The result is that the case differs greatly from *McAfee*.

The Side Agreement followed the Master Contract by more than a year, and incorporates terms which by their nature show that they were not relying on it to control their actions.[19] The negotiations with American vendors had been over for six months by the time the Side Agreement was signed.[20] Manufacture of the cars may have already started, as the first production cars were scheduled to be delivered nine months after the Side Agreement was signed.[21] Nissho Japan's and Kawasaki's delay in signing the Side Agreement show that it was not the contract which directly caused the exportation.

The Side Agreement was made *"in accordance with* the Main Contract,"[22] and was subordinate to the Master Contract. The Master Contract included all the terms and specifications necessary for the manufacture and export of the cars. The Side Agreement controlled the relationship between KHI and NIC only where the Master

---

17. Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of its Cross–Motion for Summary Judgment, at 7–8.

18. The evidence shows that MTA knew all along that it was dealing with KHI. For example, an internal MTA memo characterizes NIAC as "representing Kawasaki Heavy Industries." Defendant's Exhibit 3, at 1. The same document later referred to the two together, as "Nissho–Iwai/Kawasaki."

19. For example, NIC was to pay KHI ten percent of the contract price "within one month after the effective date of the [Master Contract.]" Side Agreement, Art. 4(1)(a), at 4. However, the Side Agreement was signed more than eleven months *after* the effective date of the Master Contract.

20. *See,* Plaintiff's Exhibit 3, at 12.

21. Master Contract, Art. X(a)(2).

22. Side Agreement, at 1 (emphasis added).

Contract was silent. The Side Agreement would remain in effect only until NIC completed performance under the Master Contract.[23] It controlled the cars only up to the point where they were delivered to NIC at the port of Kobe, Japan. It did not compel NIC to then export them.[24] This is substantially different from *McAfee*, where there were no meetings or consultations between the U.S. customer and the tailors, and the tailors were not chosen until after the contract was made with the ultimate buyer.

### D. McAfee Valued "Assembled Merchandise"

■ The case at bar involves manufactured goods, not assembled merchandise, within the meaning of Customs Regulation 19 C.F.R. § 152.103,[25] and to the extent that *McAfee* involved "assembled merchandise," it is inapplicable here. Kawasaki provided its own raw materials for the Japanese portion of the cars. As manufacturer rather than assembler, KHI had an interest in the merchandise other than as an assembler under § 152.103(a)(3). Kawasaki also provided significant technical support and warranty service after delivery.

The *McAfee* Court framed the questions before it as "whether the custom-made clothing is assembled merchandise within the meaning of the regulation and, if so, whether the transaction value of the merchandise should be determined on that basis,"[26] although it held that the transaction value should be based on the actual price paid rather than the assembly price. But the tailored suits were assembled from supplied components, and the fact that the KHI manufactured the subway cars in large part from scratch is a significant distinction between the *McAfee* export transaction and the Master Contract.

### E. Nissho Japan and Kawasaki Are Not Partners

■ The government claims that KHI and NIC were partners because KHI was named as the primary car builder in the Master Contract, and because KHI had joint responsibilities and liabilities with NIC under the contract. The two parties interacted considerably. They agreed to divide unforeseen or disputed profits and losses, to share in the selection of U.S. subcontractors and to concur on the price for U.S.-built components, among other things.[27] The government argues that they were therefore "related parties" under 19 U.S.C. § 1401a(g), and that there was no sale for exportation between KHI and NIC.

Nissho Japan and KHI agreed to allocate windfall profits and losses in the Side Agreement, but their interaction did not constitute a partnership or joint venture to produce the cars under 19 U.S.C. § 1401a(g)(1)(D) (1991). Kawasaki and NIC did not share overall profits or losses on the project, or pool their resources or expertise. Each handled its own area of responsibility as laid out in the Master Contract: Kawasaki manufactured, and Nissho Japan administered.

Nissho Japan and Kawasaki each owned no more than one percent of the other, so they were not "related parties" within the meaning of the cross-ownership provisions of 19 U.S.C. § 1401a(g)(1)(F) (1991). Their involvement does tend to show that the agreements between NIC and KHI were of

---

**23.** Defendant's Response to Plaintiff's Statement of Material Facts Not in Issue, para. 11, at 2.

**24.** Although plaintiff argues that the cars were destined for export by their very design, this can be turned around: the design specifications for the cars was found in the Master Contract, not the Side Agreement.

**25.** 19 C.F.R. § 152.103(a)(3) provides:
*Assembled merchandise.* The price actually paid or payable may represent an amount for the assembly of imported merchandise in

which the seller has no interest other than as the assembler. The price actually paid or payable in that case will be calculated by the addition of the value of the components and required adjustments to form the basis for the transaction value.
19 C.F.R. § 152.103(a)(3) (1991).

**26.** *McAfee*, 6 Fed.Cir. (T) at 95, 842 F.2d at 317.

**27.** Side Agreement, Articles 7(1), 11(5) and 20.

a different nature from the foreign transactions in either *Getz* or *McAfee*.

### F. Commissions Paid to NIAC

██ The government moves to have commissions paid to NIAC by NIC declared dutiable. The payments were made to reimburse NIAC for the cost of shipping the U.S.-made components to Japan. Customs deducted $6569.00 per car as a deduction from dutiable value at liquidation.

The government correctly points out that in order to qualify for a deductible buying commission, there must be an agency relationship.[28] Although NIAC is a subsidiary of NIC, it is not necessarily its agent for the purposes of purchasing and shipping the U.S.-made parts. NIAC and NIC explicitly agreed that NIAC would be an independent contractor "and shall not be deemed to be an agent or employee of NIC for any purpose whatsoever."[29] Of course, if there was an agency relationship between the two, it was terminated by that agreement. Restatement 2d, Agency, §§ 118–119 (1958) (authority created in any manner terminates when either party manifests to the other its intention to end the agency authority). Because NIAC was not NIC's agent, the commissions are not entitled to be deducted from dutiable value.[30]

### G. MITI Insurance

██ NIAC also claims a deduction for export credit insurance provided by the Japanese Ministry of International Trade and Industry (MITI). This protected NIAC against the chance that MTA might default on its obligations. The government points out that insurance must be an expense incident to the international shipment of goods, under 19 U.S.C. § 1401a(b)(4)(A) (1991). The insurance did not protect NIAC against loss while in transit, but rather against the possibility that MTA

might breach its contract. The Court agrees with the government that the insurance is not properly allowable as a deduction from transaction value.

### H. Escalation and Change Order Payments

Customs included escalation and change order payments to NIC's American subcontractors in the value allowed under item 807.00 TSUS for United States components. The government now concedes that those charges were correctly deducted from the value of the cars. Defendant's Response to Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment, at 9.

## IV. CONCLUSION

Because the Master Contract was the contract which caused the exportation to the United States, the government's motion for summary judgment is granted. The Regional Commissioner of Customs is ordered to reliquidate the R–62 subways cars at the price paid by the MTA to NIAC, minus applicable deductions as set forth and as conceded by the government in its briefs. The government's cross-motion for summary judgment and counterclaim as amended is granted.

**28.** *Rosenthal–Netter, Inc. v. United States*, 12 CIT 77, 679 F.Supp. 21 (1988), *aff'd, adopted Rosenthal–Netter, Inc. v. United States*, 7 Fed.Cir. (T) 11, 861 F.2d 261 (Fed.Cir.1988) (where there was no agency relationship, commissions and handling charges were dutiable).

**29.** Agreement to Acquire and Sell [U.S.-made components] between NIC and NIAC, Article 12, at 6–7, Defendant's Exhibit J.

**30.** *Rosenthal–Netter*, 12 CIT at 78–79, 679 F.Supp. at 23.